15 410 | 45 1385
15 410 | 50 1188
15 410 | 111 591 | 111 592
15 410 | 118 614

J. McConnell, Administrator, et al. v. City of New Orleans, Yeatman, Woods & Co., et al.

Where parties undertake to disturb third persons in the possession of real estate acquired at public sale, at a time when the pretensions of such parties were either unknown or considered as wanting in validity—they must make their case legally certain.

A party seeking to recover property, from a third person, as belonging to the community, should establish the marriage as conclusively as any other fact.

The suppositions and beliefs of a witness are not admissible in evidence; but the witness may state the facts from which such inference may be drawn by the court.

APPEAL from the Sixth District Court of New Orleans, *Howell*, J.

*Duncan & McConnell*, for plaintiffs. *Elmore & King*, for defendants and appellants.

Merrick, C. J. This is a petitory action, brought to recover an undivided half of a certain portion of the batture in this city.

"The plaintiffs set forth in their petition, that they represent the estate of *Mary Ann Wall*, whose succession has been duly opened in the Second District Court; that she was the first wife of *John R. Pulley;* that, at this remote period, they

are unable to state or ascertain with certainty, when or where the marriage was celebrated, but believe it took place in New Orleans, six or seven years prior to the year 1832, when *Mrs. Pulley* died; that there were four children born of this marriage, two of whom died in infancy, the other two were the petitioners, *Elizabeth*, wife of *L. P. D. Lazier*, and *Josephine*, wife of *Elijah Cox;* that a community of acquests and gains subsisted between the said spouses; that, during the existence of the said community, to-wit: on the 5th February, 1830, the said *John R. Pulley*, as the head of said community, by authentic act, passed before *G. R. Stringer*, notary, purchased from the late *John McDonogh* a certain square of ground, then fronting on the Mississippi river, and bounded on the other three sides by New Levee, Benjamin and Suzette streets, and better known as the 'Pulley Square,' that a large and valuable accretion has formed in front of said square, one undivided half of which the petitioners seek to recover by this action."

"The defendants to this suit were—

1. The City of New Orleans.
2. *John Bird*.
3. *Yeatman, Woods & Co.*

Of these defendants the last named only are before this court. The city has not appealed from the judgment against her, and the plaintiffs have acquiesced in the judgment, which maintained the plea of prescription filed by *John Bird*. The only subject for inquiry, therefore, is the defence of *Yeatman, Woods & Co*," the appellants against whom judgment was rendered.

They answer plaintiffs' petition at great length. We do not deem it important to consider any other issue, presented by their answer, except the denial of the alleged marriage between *Mary Annn Wall* and *John R. Pulley* deceased. If that marriage has not been satisfactorily proven plaintiffs cannot recover. If it be established we can then proceed to the consideration of the other issues.

The plaintiffs undertake to disturb third persons in the possession of real estate acquired at public sale at a time when plaintiffs' pretensions were either unknown or considered as wanting in validity. They must, therefore, make their case legally certain.

They allege the marriage to have taken place in this city, yet they produce no written or oral proof that such marriage was actually solemnized. They rely, exclusively, upon circumstantial evidence.

The weight of this circumstantial evidence will be best considered by observing what was required by the laws in force at the supposed period of said marriage.

If the inscription upon the tomb-stone be taken as the evidence of the age of *Mary Ann Wall*, she was a minor at that time, and also when two of the plaintiffs were born.

The marriage could not take place without the consent of the father and mother, if living, or of a family meeting, or curator. 2 Moreau, 5 and 6. C. C. 99.

And this consent was to be given or refused (prior to 1825,) in the presence of the parish judge. If consent were given, the law required it to be evidenced by an act signed in the presence of the parish judge, and two witnesses. 2 Moreau, p. 5 and 6. Old Code, p. 24, Art. 2.

If parties were of age, proof was required of that fact, and the same was registered. 2 Moreau, p. 8. C. C. 100.

Then if the parties were minors the proposed marriage was required to be published, if made prior to the promulgation of the code of 1825.

Next, the parish judge issued a license authorizing the celebration of the mar-

riage. 2 Moreau, 8. C. C. 103. If the marriage was after 1825 a bond was required of the intended husband, conditioned that there were no impediments to the marriage. C. C. 105.

The marriage itself was required to be celebrated in the parish of the domicil of one of the parties, in the presence of three witnesses, of the age of majority, and and by the parish judge, a justice of the peace, a priest, or minister of a religious sect, domiciled in one of the parishes of this State. And if the marriage took place after the promulgation of the code of 1825, an act of the celebration of marriage was required to be made and signed by the witnesses, and the person celebrating the marriage. C. C. 107.

Not a trace of any of these formalities has been discovered, neither has it been shown that the records of the parish judge have either been lost or destroyed.

The plaintiffs start out, therefore, with the presumption against them which arises from Art. 88, C. C., which says, such marriages only are recognized by law, as are contracted and solemnized according to the rules it prescribes.

They propose to overcome this presumption by the production of five witnesses, a letter and the inscription on the tomb of the deceased.

The five witnesses all concur in stating that *John R. Pulley* and *Mary Ann Wall* lived together in the same house up to the time of her death, that they had during this period four children, two of whom are the plaintiffs in interest in this suit, and so far as these witnesses observed, they, *John R. Pulley* and *Mary Ann Wall*, lived together as husband and wife, and *Pulley* treated their children as his children.

The witness *Horace Blakely* says that *Pulley* spoke of *Mary Ann Wall* as his wife, and as far as he knew she was so considered, and she was so received with some of her neighbors. He, witness, made the inscription on the tomb-stone under the direction of *John R. Pulley*. *D. S. Dewes* says, *Pulley* regretted the loss of *Mrs. Pulley*, and in speaking of her he called her *Mrs. Pulley*.

The witness *John Mitchell* used to go to *John R. Pulley's* house frequently in 1824 or 1825, but he is not precise as to the date. He considered *Pulley* as a married man. *Mrs. Pulley* was buried in the Protestant Graveyard in this city, with two of her children in the same tomb. *Pulley* and wife kept house together as man and wife two or three years previous to her death. The oldest child at that time was 14 or 15 years of age. There were four living. *Mrs. Pulley* was 30 or 35 years of age at the time he visited the house. *Pulley* introduced his wife to witness with these words: "This is my wife, and these are my children."

*Charles Harrod* says, he first became acquainted with *John R. Pulley* in 1820; supposed him to be a married man at that time. Saw him, and the lady he supposed to be his wife, crossing the lake frequently between 1820 and 1825, and again in 1830.

In 1830 the children appeared to be from 5 to 8 years of age. He thinks when he first saw *Mrs. Pulley* she was thirty years of age. He supposed they were married from the manner in which *Pulley* treated *Mrs. Pulley* and the children on the steamboat in crossing the lake.

*C. H. Craling* says, he was acquainted with *Pulley* from 1829; lived in his yard; rented a house from him for two years. Witness cannot say whether he was married or not. *Pulley* invited witness to his house, and introduced him to *Mrs. Pulley* by saying: "This is my wife and these are my two daughters." He, witness, had no reason to doubt but what she was his wife. When he first knew the family in 1829, the oldest child was about three and the other two years old;

there was about a year and a half difference in their ages: knew this because the children used to come to witness nearly every day. The mother of *Mary Ann Wall* lived in Hunter street—not with *Pulley*—witness did not talk with her much."

The deposition of *M. Wakeland* was taken by defendants, and not being sufficiently favorable was used by the plaintiffs. He lived with *John R. Pulley* three years; became acquainted with him in 1831, and was living with him when *Mary Ann Wall* died in 1832. She lived with *Pulley* as his wife and was called by his name. She was living with him in 1828 when witness visited New Orleans and boarded with him for a few days. They passed as man and wife. He called her *Mrs. Pulley*. The youngest child, *Josephine*, was born in 1830 or 1831, the other, *Elizabeth*, was one or two years older. The parties lived together as man and wife, and she was buried as *Mrs. Pulley*, and the family went into mourning and the tomb-stone was inscribed *Mrs. Pulley*. As far as witness knew, *the general understanding, or public reputation* upon the subject of the relation existing between them was, *that they were not married*. In another place he says they lived together as man and wife, and he would not have suspected any thing to the contrary than that they were lawfully married, had he not heard before he went to New Orleans to live that they were not married, and having frequently heard from others there that they were not.

The following is the letter relied upon by plaintiffs:

New Orleans, 19th June, 1832.

*Dear Mary*—I have received a letter from *Captain E.*, which informs me you have had difficulty with *Betsey*. I have sent papers to *Mr. Cambell*, which I think will set her at liberty; if not, I shall visit Mobile in a day or two. If you feel well enough, I think you and children had better return by the schr. Splendid. *Captain E.* will furnish you with any necessaries you may want.

Yours, J. R. P.

Enclosed you have $50.

*Mrs. Mary Ann Pulley.*

Superscription—"*Mrs. Mary Ann Pulley*, Mobile, A."

The inscription on the tomb was:

MARY ANN PULLEY,

Died July 7, 1832.
Aged 21 ys.

J. P. ag. 7 ds. &
R. P. ag. 7 mó.

J. R. P. E. P. J. P.

Neither the letter nor the inscription on the tomb is conclusive. It is shown by defendant's evidence, that *Mary Ann Wall* was *reputed* to be the mistress or concubine of *John R. Pulley*; a fact of which he could hardly have been ignorant. It may then be asked, why did not *Pulley* insert in the inscription on the tomb the words "wife or consort of *J. R. Pulley*," when there was so much necessity for it? It is said by a witness, it was to give space for the initials of the children. But we see from the copy or *fac simile* in the record, there was room sufficient for the initials and the full name of *Pulley* also. The age mentioned on the tomb is in conflict with the testimony of *Mitchel* and *Harrod*. The letter proves that

he addressed *Mary Ann Wall*, whether his wife or not, in writing as he did at his house. But here again, as on the tomb, his name is withheld, and initials only are given.

*John R. Pulley* lived in the same house with *Mary Ann Wall;* she was the mother of his children, and presided at his table. His employees appear to have lived with him. He may have felt constrained, by a sense of propriety, to call her by his name in the presence of his children and household, and such persons as visited his house. If we assume this to be the fact, the case presents little or no difficulty. The plaintiffs' witnesses have spoken of what they observed and heard, and it is not irreconcilable with the testimony of defendants' witnesses.

The testimony on the part of defendant shows, that *John R. Pulley* was, at that time, to-wit, when he lived with *Mary Ann Wall*, a man of considerable means; that he dealt, to some extent, in real estate; that it was a matter of public notoriety, that he was not married. One witness, *Mrs. Short*, says the common report in the neighborhood (where *Pulley* lived) was that *Mr. Pulley* and this woman were not married, though they lived together as man and wife.

Another witness says, it was a matter of public notoriety among dealers and speculators in real estate, that *John R. Pulley* was an unmarried man; it was known that he lived with a female reputed to be his mistress.

Other witnesses depose, that the public report was to the effect that *Pulley* and *Mary Ann Wall* were not married.

It is further shown, that *John R. Pulley* mortgaged and conveyed immovables to shrewd and cautious dealers in real estate, and that in no instance was it stated in the act of sale or mortgage, that he was a married man; nor is there any instance, where the woman with whom it was notorious that he lived, was called upon to renounce her rights as a married woman.

Again, in 1849, after the death of *John R. Pulley*, his widow, *Ellen Brush*, put at issue the legitimacy of one of the plaintiffs, whose husbands had applied for letters of administration upon the estate. This issue was permitted to rest without trial, and another person was appointed curator.

In regard to such events as births and marriages, women usually are very well informed, yet it is somewhat singular that the plaintiffs have not called a single witness of that sex.

Again, *John R. Pulley* lived until 1849, when the plaintiffs were, according to every calculation, over twenty-one years of age. If the marriage had existed, would they not have been informed by the father or mother's relatives where and when it took place? Yet, after an exception had been filed to the petition, and the plaintiffs were ordered by the Judge to state the date of said marriage more definitely, the administrator, after diligent inquiry of those most likely in his opinion to know, confesses his inability, and from such information, avers his belief that said marriage took place in the city of New Orleans certainly some years prior to 1830, but how long prior he is unable to learn.

We conclude that the plaintiffs have not established the fact of the marriage between *Mary Ann Wall* and *John R. Pulley* by sufficient proof. They must make their case not only probable, but certain. They have failed, as previously observed, to produce any evidence written or oral of an actual marriage, and the presumptions to be drawn from the circumstantial proof adduced by them are overcome by others more cogent. As the consequences of the proof of a marriage under our law often affect third parties holding property in good faith, which may thus be declared to belong to the community, to their prejudice, we think the

party seeking to recover should establish the marriage as conclusively as any other fact. Without therefore saying that the marriage did not exist, we content ourselves by repeating that it has not been made to appear by sufficient proof.

We observe but one bill of exception which requires our notice. The plaintiff offered to prove by the witness *Harrod* " his supposition and belief, from his personal knowledge with *John R. Pulley*, that he was a protestant, and would have made application to the Rector of Christ's Church New Orleans, to perform the marriage ceremony," and that the usual record of such marriage would have been preserved among the records of said church."

The object was to create a presumption that the evidence of this marriage was destroyed with a portion of the records of that church. It is clear the suppositions and the belief of the witness are not evidence. The witness might have stated the facts from which such an inference might have been drawn by the court, such as, the fact that *Pulley* was a member of that church, or attended service there, or the like.

The District Court did not err in excluding the evidence.

The judgment must be reversed as to the defendants, *Yeatman, Woods & Co.*

It is, therefore, ordered, adjudged and decreed by the court, that the judgment of the lower court be avoided and reversed as to said appellants, *Yeatman, Woods & Co*; and it is now ordered, adjudged and decreed, that there be judgment in their favor, and against the demand of the plaintiffs against them, and that they recover their costs in both courts.

Land, J., absent.