Statement of the Case.
MONROE, C. J.
This is an appeal by defendant from a judgment awarding the two plaintiffs (Rachael Green, wife of Caesar Frederick, and Mary Green, wife of James Woodfork), as the surviving sisters of Elijah Green, deceased, $2,000 as damages alleged to have been sustained by them in consequence of his death, said to have been caused by an assault made upon him by the conductor of one of defendant’s trains, upon which he was a passenger.
Defendant denies, among other things, that decedent was the legitimate brother of plaintiffs, and we shall first consider that question.
It is alleged that plaintiffs and the decedent were born of a marriage between William Green and Martha Tillman, but no written or oral evidence (save as will be here mentioned) has been offered to prove that such marriage was ever actually solemnized, and circumstantial evidence alone is relied on for its establishment.
Mary (Green) Woodfork testifies that her mother died in 1908, at the age of 42 years, 6 months, and 1 day; that she had lived with her, in New Orleans, for the 15 years preceding her death, during which period, and until his death, in March, 1912, her father had lived in Gretna; and that she was 17 years old when her mother died. She admits that she has no recollection of what occurred when she was 2 years old, and when, according to her theory, her mother separated from her father and came to New Orleans, from which it follows that her parents never lived together within her recollection, and that she does not know whether they had ever done so. She also testifies that she had seen a “license,” in her mother’s possession, but had been unable to find it after her mother’s death.
Ed. Coleman-testifies that he is a minister of the gospel (and it is otherwise shown that he succeeded Charles Matthews in the pastorate of a negro Baptist church in Gretna) ; that he was an officer of the church about 28 years ago (meaning 28 years prior to June, 1914, or say in 1886), and was pres *123 ent when Wm. Green and Martha Tillman were married by Matthews.
On his cross-examination, he gives the following testimony:
“Q. Do you know where they were married, of your own knowledge? A. No, sir; I don’t know exactly; they were living on the railroad with their mother. * * * Q. You weren’t present at the marriage, and don’t know that they were married, except from what you were told? A. No, sir. Q. According to the rules of your church, you don’t permit any one but people who are married, or single, to be members of your church, and you deduce from that fact that Martha Tillman and William Green were man and wife? A. Yes, sir.”
He repeats, on re-examination, that they were married “about 28 — -between 28 and 27 — years ago”; but he also testifies that a certain race trouble occurred in 1886, or about that time, and that they separated, Martha coming to New Orleans, and leaving William in Gretna, and that he never saw her afterwards. Again, he testifies that they lived together, as man and wife, in Gretna, for 11 years, prior to 1886, and that she, during that period, gave birth to two children, Rachael and Elijah (otherwise called William Green, Jr.), and possibly a third child, according to which testimony those children must have been born before the marriage and while the mother was between 3% and 14% years of age, and the plaintiff Mary must have been born quite a number of years after her parents had effected a separation, which lasted until they died.
Viola Johnson knew Martha Tillman in childhood, and William Green “a considerable time.” They were married “28 years ago” by Charley Matthews, lived together after the marriage, and had three children (to the knowledge of the witness), Rachael, Elijah, and Mary. They separated “a good while” ago; does not remember how many years.
“Q. In other words, they had four children, and the last child had died when they separated? A. Yes, sir. Q. Where did she live after they separated? A. Right on the Morgan Railroad [in Gretna]. Q. Where did she live after that? A. On the main street [also in Gretna]. * * * Q. All that you know about the marriage is what they told you? A. Yes, sir; and I know that she was received into the church, and she had to be married to join the church.”
Lottie Cole knew Martha Tillman a long time; did not know whether she was married to William Green, but she was baptized with witness, “and she had to get married, because they won’t baptize you unless you are married.” Witness was not married when she was baptized. Martha and William Green lived together in Gretna, and she was considered the wife of Green; does not know how long they so lived, nor how many children they had; thinks she was baptized as Mrs. Green.
“Q. You don’t know anything about any children that were born? A. No; I don’t think she had any. Q. I mean when she joined the church? A. I can’t say, positive. * * * Q. How many years ago was it when you joined the church? A. I don’t know.”
John Tillman (brother of Martha Tillman) testifies that, according to his information, his sister and William Green were married “about 28 or 29 years ago”; he being on Red river at that time, and 11 or 12 years of age. Being asked (the leading question) whether he had ever seen a certificate, “given by the preacher,” of the marriage, he answered that he had, but he supposes that it was misplaced when his mother died. Thereafter, on cross-examination, he was asked by whom the certificate was signed, and he answered, “If I ain’t mistaken, Judge Gardere was supposed to be the justice of the peace and running that court.” He was then asked, “Married by a judge?” and he replied, “Got the license from the judge and married by the preacher.” He testifies that he received a letter from his sister, just before her marriage, as follows:
“Q. You read that letter? A. I read a portion of it; after I found out she was married, it suited me.”
He had previously given the following testimony:
*125 “Q. After they were married, hew soon after that, did you come back to Gretna? A. I came back just about 4 or 3 months after. * * * Q. And was it after they had these children? A. She had one; yes, sir. Q. How long did they live together as man and wife? A. Oh, I couldn’t tell how long; quite a while. Q. During that time they had these three children? A. Yes, sir. Q. They were always considered as man and wife by the people of the community? A. Yes, sir.”
Opinion.
[1] The law declares that marriage is considered in no other view than as a civil contract, and that such marriages only are recognized by law as are contracted and solemnized according to the rules which it prescribes. C. C. arts. 86, 88. It further declares (Act 25 of 1882, amending and reenacting O. O. art. 99) that licenses to celebrate marriages, in the other parishes of the state (than the parish of Orleans), shall be granted by the clerks of the courts, unless the clerk himself should be a party to the marriage, when the license shall be granted by the district judge; that, before granting the license, the person authorized to issue the same shall require a bond of the intended husband (C. C. art. 101); that any minister of the gospel, or priest, of any religious sect, may celebrate marriages, upon complying with the regulations of the law (C. C. art. 102); that no minister shall celebrate a marriage without having obtained a license (C. C. art. 104); that the marriage must be celebrated in the presence of witnesses and evidenced by an act signed by the parties and witnesses, a duplicate of which, appended to the license, issued in duplicate, must be returned, within 30 days, to the person who granted the license, who shall file and record the same in his office (C. C. art. 105).
The provision of article 105 (formerly article 107) requiring the return and registry of the act was added, by amendment in 1855 (R. S. 2205). Prior to that time, in Holmes v. Holmes, 6 La. 467, 26 Am. Dec. 482 (decided in 1834), the following contention had been urged in this court, to wit:
“The fact of marriage should be proved by the act or certificate contemplated in article 107 of the Civil Code, nor should inferior evidence be allowed, unless it were proved that this act had been lost or destroyed. The marriage license should also be produced, since without it the person celebrating the marriage was not authorized to do so.”
In passing upon that contention, and deciding the ease, the court, speaking through Mr. Justice Bullard, said:
“Our Code does not declare null a marriage not preceded by a license, and not evidenced by an act signed by a certain number of witnesses and the parties; nor does it make such an act exclusive evidence of a marriage. These laws relating to forms and ceremonies, here regarded as directory to those alone who are authorized to celebrate marriages, are intended to guard against hasty and inconsiderate marriages in defiance of parental authority. Like all other contracts, it may be proved by any species of evidence, not prohibited by law, which does not presuppose a higher species of evidence within the power of the party; and cohabitation as man and wife furnishes presumptive evidence of a preceding marriage. * * * If a different rule of evidence prevails in Eranee, it is because the Code, as well as previous ordinances, provided for public registries of marriages, births, and deaths, under the care of special officers, called ‘officiers de l’état civil.’ Extracts from these registers are declared to be full evidence until proved to be forged; and, second, any evidence is inadmissible without first proving that no such register was kept, or that it has been lost or destroyed. Merlin’s Repertoire, verbo Etat Civil. Our law has not enacted such a registry of marriages. We think the court erred in rejecting the evidence offered.”
Whatever may be said of the application to a case such as this of C. C. art. 88 (formerly C. C. art. 89), it would appear, since the amendment to article 107 (now article 105), requiring the return and registry of the act of marriage, to be a plain, elementary proposition that, in any case in which it is sought to prove a contract of marriage, the proponent should be required to produce a certified copy of the public record which the law declares shall be made of the contract, and that, until it be shown that such record has been lost or destroyed, no secondary or inferior evidence, offered to create a pre *127 sumption that such contract.had been entered into, should be received.
If that be not true, then there can be no reason why any contract, whether of sale, mortgage, or otherwise, which the law requires to be reduced to writing and recorded, or any instrument, such as a will, required to be in writing, should not be proved by parol evidence, without an attempt to show either its original existence or its loss or destruction.
The requirement thus stated is fully recognized in the matter of Powers v. Executors of Charbmury, 35 La. Ann. 632, 633, in which the question under consideration is, perhaps, more thoroughly considered than elsewhere in our jurisprudence. It is there said:
“As plaintiff has been unable to prove the celebration of the marriage, she was compelled to have recourse to evidence, parol and documentary, for the purpose of showing long cohabitation as man and wife, the birth of children from their union, and general reputation of marriage among their neighbors, acquaintances, and friends. * * * Although our jurisprudence fully recognizes the doctrine and the rule that marriage will be presumed from reputation and long cohabitation, we cannot lose sight of the fact that, under our law, marriage is a contract, and that the best proof of that contract is the evidence of some act, as prescribed in the Civil Code, showing at least the consent or agreement of the parties to enter into the contract of marriage. * * * Among other provisions, we find the solemn declaration that ‘such marriages only are recognized by law as are contracted and solemnized according to the rules which it prescribes.’ O. C. art. 88. In the .interest of persons who were the issue of marriages of which no direct proof could be adduced, and in the interest of legitimacy, courts have somewhat relaxed the rigor of the precept, and have sanctioned the rule which allows the proof of marriage by reputation, long cohabitation, and by other circumstantial evidence. But such evidence must show that the beginning of the relations between the parties must have been characterized by the free consent of the parties to contract the obligations and to assume the responsibilities of marriage; and the evidence must exclude the idea that the union began and that the parties wore drawn together merely through the promptings of sensuality. Such conditions, even when followed by long cohabitation, although openly or publicly acknowledged, can result in nothing but concubinage, the parent of bastardy, the immoral impediment to marriage, and the fruitful source of shame and dishonor.”
In McConnell, Adm’r., et al. v. City of New Orleans, 15 La. Ann. 410, it was said of the plaintiffs, who were seeking to establish a marriage in order to recover property:
“They allege the marriage to have taken place in this city, yet they produce no written or oral proof that such marriage was actually solemnized. They rely, exclusively, upon circumstantial evidence. The weight of this circumstantial evidence will be best considered by observing what was required by the laws in force at the supposed period of said marriage.”
The court then recapitulates the various provisions of the law, pertinent to the question at issue, which were in force in 1832, when the marriage under consideration was said to have taken place (and which did not include the requirement of registry, subsequently enacted), and the opinion proceeds:
“Not a trace of any of these formalities has been discovered, neither has it been shown that the records of the parish judge have either been lost or destroyed. The plaintiffs start out, therefore, with the presumption against them which arises from article 88, C. C., which says such marriages only are recognized by law as are contracted and solemnized according to the rules it prescribes. They propose to overcome this presumption by the production of five witnesses, a letter, and the inscription on the tomb of the deceased.”
The testimony of the five witnesses, to the effect that the couple whose marriage was at issue were regarded and received as man and wife, with other testimony to the contrary effect, was then considered, and it was held that the marriage had not been established.
[2] In the instant case, it is not shown (otherwise than by the somewhat casual references that Mary Green and John Tillman made to the “license,” said to have been in the possession of Martha Tillman) that the slightest effort was made to find any written trace or record of Martha Tillman’s alleged marriage to William Green. It may be said that, by not objecting, upon the trial, to the introduction of parol evidence, defendant waived its right to object in this court, and *129 that may be true; but that does not relieve the plaintiffs of the obligation to prove that their parents were legally married, and, as the best evidence on that subject would have been a copy of the recorded act, certified by the clerk of the court, it is to be presumed that they would have produced such a copy, if the original had been recorded, as it is also to be presumed that an original act would have been executed and recorded, if the marriage had taken place, since the law so required, and it is always presumed, until the contrary be shown, that a public official has discharged the duty imposed upon him. If, however, it be conceded that such a presumption can be destroyed, and a presumption of marriage created by parol evidence, of a convincing character, to the effect that the two persons concerned entered into their relations with the bona fide intention of permanently assuming the obligations and responsibilities of marriage, and that they carried that intention into effect, we are constrained to say that the evidence offered in this case falls considerably short of producing that conviction. We are unable to determine when the two parties, here said to have been married began to live together, or when they separated, whether they entered the church before marriage, or after, nor are we informed of the steps that were taken by the church to ascertain whether applicants for admission were married, or single; that is to say, whether the mere assurances of the applicants were accepted, or it was required that the formalities prescribed by law should have been observed. One of the plaintiffs testified that she had been married shortly after the death of her mother, but had separated from her husband at the end of a month, and we should hardly feel authorized to hold that an experiment of that duration would be sufficient, of itself, though the couple might have been recognized and received as married, to establish the marriage. There are some persons who change their mates with great facility, and find a new wife or husband on every plantation upon which they are employed.
In Casimir v. Blanc, Executor, 10 Rob. 448, the fact that the parties, whose marriage was sought to be established, did not remain together, but separated and entered into other relations, was regarded as a strong circumstance to defeat the presumption of marriage arising from their having, for a time, lived together as man and wife and having a son, to whom the father had given a copy of a certificate of baptism containing the recital that he was legitimate. On the other hand, in Blasini v. Succession of Blasini, 30 La. Ann. 1390, the fact that the parties, from the time of their first appearing in the community in which they made their permanent domicile, lived together as man and wife, “without separation or interruption until death intervened,” was regarded as a strong circumstance in the establishment of the presumption of marriage arising from their so living.
[3] It has been settled by several decisions of this court that article 2315 (as amended and-re-enacted by Act 71 of 1884 and Act 120 of 1908), under which this suit is brought, applies to actual and legitimate relations, and that its provisions cannot be extended to reach other persons to whom they do not expressly apply; hence, as plaintiffs have not established for themselves the required status, of legitimate sisters of the decedent, by reason of whose death they allege that they have sustained injury, they are not entitled to recover. Lynch v. Knoop, 118 La. 611, 43 South. 252, 8 L. R. A. (N. S.) 480, 118 Am. St. Rep. 391, 10 Ann. Cas. 807; Vaughan v. Dalton-Lard Lumber Co., 119 La. 61, 43 South. 926; Landry v. American Creosote Works, 119 La. 231, 43 South. 1016, 11 L. R. A. (N. S.) 387; Mount v. Tremont Lumber Co., 121 La. 64, 46 South. 103, 16 L. R. A. *131 (N. S.) 199, 126 Am. St. Rep. 312, 15 Ann. Cas. 148; Flash v. Louisiana Western R. Co., 137 La. 352, 68 South. 636, L. R. A. 1916E, 112. It is therefore ordered and decreed that the judgment appealed from be reversed, and that there be judgment in favor of defendant, rejecting plaintiffs’ demand and dismissing this suit at their cost.
SOMMERVILLE, J., concurs.