No. 3991

Second Circuit

(Second Division)

SPILLMAN v. TEXAS & PAC. RY. CO.

(June 11, 1931. Opinion and Decree.)
(July 16, 1931. Rehearing Refused.)
(October 5, 1931. Writs of Certiorari and Review Refused by Supreme Court.)

See, also, 10 La. App. 379, 120 So. 905.

M. L. Dismukes, of Natchitoches, attorney for plaintiff, appellee.

Peterman, Dear & Peterman, of Alexandria, and Spencer, Gidiere, Phelps & Dunbar, of New Orleans, attorneys for defendant, appellant.

474

TALIAFERRO, J. Apparently this suit is brought by Mrs. Artemise Madine Spillman, individually and as natural tutrix of her five minor children, to recover damages of the defendant railway company to the amount of $25,000, for the death of John Spillman, her alleged husband.

It is alleged in the petition that between the hours of 1 and 2 o'clock, the morning of December 6, 1926, a freight train of defendant company, through the gross carelessness and negligence of its agents and employees, and by them operated, ran into and struck said John Spillman at or near milepost 224 on defendant's tracks in Natchitoches parish, inflicting injury upon him from which he died.

It is further alleged that deceased left his home in the town of Cloutierville, on the night of December 5th, to visit his father-in-law, who lived 2 miles south; that he followed the public road until it crossed the railroad right of way, and then adopted the right of way as the shorter route to his destination; that said deceased never reached his destination, but was found the morning of December 6th by a crew of workmen of defendant company in a reclining position, unconscious, along the edge of the line of cross-ties; that he was taken to his home promptly and the following night was sent by railroad to the Charity Hospital in New Orleans for treatment; that he died there December 19th of concussion of the brain and fracture of the skull inflicted by said train of defendant, without regaining consciousness.

It is further alleged that defendant's track, east and west of the spot where said accident occurred for a distance of three miles, is straight and the view unobstructed; that said right of way was generally used by pedestrians going from place to place along the railroad to the knowledge of the company, its agents and employees, and without objection from them.

The deceased was alleged to be 35 years of age at the time of his death, with a long life expectancy; that he earned an average of $100 per month, which he expended in the support and comfort of his family.

Defendant's answer admits its Louisiana domicile and corporate capacity as alleged, and that John Spillman was found at the time, place, and in the condition described in plaintiff's petition, but in all other respects the allegations of fact contained in plaintiff's petition are denied; and for further answer defendant says:

"That a shot gun, one shoe and a partially filled bottle of whiskey (commonly called 'hootch' or 'corn liquor') and identified as belonging to him, were found near the body of said John Spillman; that he was a trespasser on respondent's right of way and was under the influence of liquor, as he was reputed to be a frequent and inordinate user of alcoholic liquors; that between the hours alleged in the second article of plaintiff's original petition, namely, between one and two o'clock on the morning of December 6th, 1926, an extremely dense fog hung over that part of the track near the place where Spillman was found, and did not lift until after nine o'clock the following morning; that the only discoverable injury to the said Spillman was a skull wound and laceration of the right side of the head near the ear; that any train or trains which passed the place where said Spillman is alleged to have been struck between one and two o'clock on the morning of Monday, December 6th, 1926, were manned by full train crews; that the engineer and fireman of any or all of said trains, were at their respective posts of duty in the cab of the engine; that neither they nor any member of the train crew or crews had any knowledge of having struck said John Spillman; that said train or trains were equipped

with all modern appliances which were in complete order and operating perfectly; that there was no fault or negligence of any kind on the part of any of respondent's employees in charge of said train or trains; and that if it be proven, as alleged, that said John Spillman was struck by one of respondent's trains (which is denied), then respondent avers that such striking and injury was due either wholly to the fault and negligence of said Spillman, or that he materially contributed thereto, and brought about the accident to himself by his own fault, in consequence whereof your respondent is not liable in law to the said plaintiff upon her demands as made in this suit."

There was judgment for Mrs. Spillman individually for $6,000, from which defendant appeals.

The present appeal is the second in this case. On first appeal the judgment of the lower court was reversed on account of a defect in the citation, and the case was remanded for further proceedings as the law directs. 10 La. App. 379, 120 So. 905.

Plaintiff has answered the appeal, praying that the judgment in her favor, individually, be increased to at least $10,000 or $15,000, and that the minors should be awarded judgment for the amount of difference between the judgment awarded her individually and the $25,000 sued for.

In this court defendant filed an exception of no cause or right of action to plaintiff's petition. In oral argument and brief it is urged that no cause or right of action is disclosed by plaintiff's petition, and that it is not affirmatively alleged, nor has it been proven, that petitioner, Artemise M. Spillman, and John Spillman, the deceased, were legally married, or that she has legally qualified as tutrix of her children.

A supplemental brief has been filed by plaintiff's counsel wherein the lack of merit of this exception is discussed at length, and we are asked to overrule same, but, in the alternative, should we reach the conclusion that the exception is well founded, that the case be remanded to the district court for the purpose of introducing evidence to establish that Mrs. Spillman had qualified as the natural tutrix of her children, and had been legally married to the deceased, John Spillman.

Counsel for defendant do not contend that plaintiff and deceased were not lawfully married, nor that she has not qualified as natural tutrix to her minor children, but do assert strenuously that, inasmuch as no affirmative allegations on these questions are contained in the petition, and that no evidence was offered or received to establish either fact, no recovery can be had either by the widow or the minor children.

The petition in this case, after the caption, reads:

"The petition of Mrs. Artemise Madine Spillman, a resident of your said parish and state, individually and as natural tutrix of her minor children, Bessie, Emma, John Lloyd and Joseph Spillman, with respect represents and shows."

This descriptive reference to Mrs. Spillman as tutrix of her children, and to the children themselves, is the only one contained in the petition, excepting that in paragraph IX, after referring to the age of the deceased, his industrious qualities and earning capacity, it is said:

"All of which amount he used in the support and maintenance and care and comfort of your petitioner and her minor children. That by his death they have suffered a very great loss."

In several places in the petition reference is made by plaintiff to deceased as

"her husband," but nowhere therein is the slightest reference made to a marriage having been contracted between them.

Paragraph X of the petition reads as follows:

"Your petitioner has been injured and damaged by the gross carelessness and negligent killing of *her husband*, John Spillman, by said Texas and Pacific Railway Company, its agents and employees, in the sum of Twenty-five Thousand Dollars as follows, to-wit:

"(a) For the grief, pain, sorrow, and mental distress of petitioner, caused by the violent and cruel death of petitioner's *husband*, Five Thousand Dollars.

"(b) For the loss of *her husband's* love and affection and companionship, Ten Thousand Dollars.

"(c) For the loss of *her husband's* assistance and support, Ten Thousand Dollars."

The prayer is that "she have judgment" against the railway company for $25,000, etc.

The question of the marriage herein discussed was not directly raised in the lower court, but all of the articles of the petition wherein deceased is referred to as the husband of plaintiff are denied in defendant's answer.

After this case was remanded for new trial by this court, in March, 1929, an amended petition was filed by plaintiff praying for another service on defendant. The first paragraph of this petition reads in part, viz.:

"The supplemental and amended petition of Mrs. Artemise Madine Spillman, a resident of the parish of Natchitoches," etc.

The minors are not mentioned nor referred to.

She prays for judgment as follows:

"Adopting all of the allegations of the said original petition and prayer thereof * * * prays that plaintiff do have and recover judgment in her favor," etc.

The judgment of the lower court is in favor of Mrs. Spillman, individually. No reference is made therein to the minors.

We have not found, nor have we been cited to, a case wherein the pleadings and the facts presented propositions like those we are now considering. Many cases are reported wherein the legality of marriages and legitimacy of claimants are put at issue and threshed out in the trial court.

Our Supreme Court has repeatedly held that a beneficiary under article 2315 of the Code, as amended, must be, in the case of children, offspring of a union contracted in the manner of and pursuant to legal requirements; and, in case of the surviving widow, that her relation to deceased must have originated by virtue of a marriage engagement entered into and celebrated as provided by our laws. Green et al. v. New Orleans, S. & G. I. R. Co., 141 La. 120, 74 So. 717; Youchican v. Texas & P. Ry. Co., 147 La. 1080, 86 So. 551.

In Vaughan v. Dalton-Lard Lumber Co., 119 La. 61, 43 So. 926, the court ruled that this statute was sui generis, and was neither a law of inheritance nor a law of marriage. In that case it was held that a putative wife could not recover damages for the death of her husband.

In the Green case, 141 La. page 128, 74 So. 717, 719, Mr. Justice Monroe, discussing the question of the necessity of introducing proof to establish the marriage there in question, says:

"In the instant case, it is not shown * * * that the slightest effort was made to find any written trace · or record of Martha Tillman's alleged marriage to Wil-

liam Green. It may be said that, by not objecting, upon the trial, to the introduction of parol evidence, defendant waived its right to object in this court, and that may be true; *but that does not relieve the plaintiffs of the obligation to prove that their parents were legally married*," etc.

It is elemental that one claiming a right dependent upon a legal marriage must establish that fact, when denied, as he does any other circumstance connected with his cause of action.

In the case of Lynch v. Knoop, 118 La. 611, 43 So. 252, 8 L. R. A. (N. S.) 480, 118 Am. St. Rep. 391, 10 Ann. Cas. 807, the mother sued for damages for the death of her minor daughter. Defendant filed an exception of no cause of action, and then answered, denying the legitimacy of the child on the ground that she was not the issue of a lawful marriage. The court, on the question of burden of proof, in syllabus, said:

"Defendant denied that plaintiff's child was a legitimate daughter, and tendered an issue requiring proof of marriage. Plaintiff declined to furnish proof of her marriage, on the ground that the burden of proof was with defendant. The marriage, if there was a marriage, was peculiarly within her knowledge. If she held the proof, relief cannot be allowed, nor damages." Jackson's case, 46 La. Ann. 236, 14 So. 514; McConnell v. City of New Orleans, 15 La. Ann. 410; Castagnie v. Bouliris, 43 La. Ann. 943, 10 So. 1.

The court, after deciding that plaintiff could not recover for the reason that she had not discharged the burden of proof on the issue vel non of legitimacy of her child, proceeded to decide the case on its merits and rejected plaintiff's demand on that score also. In this case it was also held that the right of action under Act No. 71 of 1884, amending article 2315 of the Civil Code, in favor of the mother and minor children, does not include a natural mother or natural child; that legitimate relationship only was the legislative intent.

In the case at bar, as defendant has not admitted that deceased was the lawful husband of plaintiff, but, on the contrary, denied each of her allegations specifically wherein deceased was referred to as her husband, the issue of marriage was sufficiently tendered to necessitate the introduction of affirmative and formal proof on part of plaintiff establishing such marriage. The burden was on her to do this.

Plaintiff has not alleged that she has been appointed and has qualified as natural tutrix of her minor children. No proof was offered or received to establish that such had been done. She did not pray for judgment in their favor for any amount.

Our appreciation of the petition in this case is such that it cannot be construed to be a suit in behalf of the Spillman minors. The prayer of a petition characterizes the nature of the suit, and discloses for whom relief is sought. Myers v. Dawson, 158 La. 753, 104 So. 704.

We are of the opinion the exception of no cause or right of action, directed against Mrs. Spillman's right to recover as surviving widow of deceased, for the reason that she had not alleged, nor proven, that she and deceased were legally married, is well founded.

However, having reached the conclusion that plaintiff is not entitled to recover on the merits, we will not remand the case for evidence on the question of the marriage mentioned, but, as the Supreme Court did in case of Lynch v. Knoop, supra, we shall decide the case on its merits and finally dispose of it.

Defendant propounds two propositions of defense, viz.: (1) That it has not been proven that the injury of which John Spillman died was caused by its train; and (2) that, if the proof does show that its train inflicted the injury of which deceased died, his own contributory negligence bars recovery by his widow, even though it be conceded that defendant's employees were negligent in the operation of the train.

Plaintiff testified that her husband left their home in the village of Derry, in Natchitoches parish, at the hour of 9 o'clock, Sunday night, December 5th, with his shotgun to go to her father's place, a few miles distant, to join him in a duck hunt the next morning. He never reached his destination, but was found the following morning at about 9 o'clock by a section crew of defendant on its right of way, some 12 or 15 feet from the rails, near milepost 224, less than 2 miles south of Derry, unconscious, talking incoherently, with a scalp wound or laceration 3 or 3½ inches long, on level with the right ear. He was raised by Remus Lavespere, and with his aid was conducted to Lavespere's home about one-fourth of a mile away, and there placed in an automobile and driven to his own home. That night he was sent to the Charity Hospital in New Orleans by railroad, where he died on December 19th, without regaining consciousness. The wound was X-rayed two or three times at the hospital, but no fracture of the bones of the head was found. The physician at Derry who examined deceased on December 6th also found no fracture. There was no other visible wound on or injury to the body.

At the spot where deceased was discovered the morning of December 6th near the end of the cross-ties was also found his shotgun, his right shoe off, and a soda water bottle containing a small quantity of corn whisky. Blood signs were observed on the end of a cross-tie and on the ground where, as one of the witnesses expresses it, "he fell and rolled into the ditch."

Only one witness was produced who claims to have seen the deceased on the railroad track the night of December 5th. This witness, Clifford Bell, testified that he had been hunting and marking cattle on Sunday, the 5th day of December, and returning home that night between the hours of 11 o'clock p. m. and 1:30 o'clock a. m., as he emerged from the thick woods into the open country next to the defendant's track east (south) of Derry he saw the light of a train as it rounded the curve at that place, moving south and approaching him; that he was traveling on horseback parallel to, and about 50 feet from, the track; that as the train's light grew brighter and the distance between him and it lessened he observed an object on the track about 500 yards away, which distance, on reflection, he reduced to 250 or 300 yards; his testimony, in part, being as follows:

"Q. What kind of night was this?
"A. It had been raining, and it was drizzling a little bit.
"Q. With the light of the engine shining down there, how far were you from the object when you first saw it?
"A. When I met and looked at the object, how far was I from the object?
"Q. Yes.
"A. I was about—oh about 500 yards, probably nearer, I don't think it was hardly that far.
"Q. About as near as you can guess, about how far was it?
"A. If you will give me time, I can tell right about how far it was.
"Q. Take all the time you want.
"A. About 250 or 300 yards from where I first made out the object.
"Q. How far were you from the object before you could clearly discern it was a human being?
"A. I was in about 100 yards, I was go-

ing to it and a little bit off, about 75 degree angle.

"By the Court:

"Q. What conclusion did you reach when you were 250 yards as to what the object was?

"A. I was getting nearer to it, I was coming meeting it, and did not get quite up to it.

"By Mr. Dismukes:

"Q. What the judge wants to know, if you had any idea what the object was.

"A. I could tell it was a man, but could not tell who it was. I could not tell whether it was colored or white.

"Q. When you first saw it you could tell it was a human being?

"A. Yes, when the light got great enough, I could see it was a human being.

"Q. When you got within 100 yards.

"A. I was right opposite with it and the train passed by."

He further states that this person was sitting on the end of the cross-ties, and that he was near to milepost 224; that he observed the man until the train was within a few feet of him, and after the train passed he saw no more of him; that the train was a freight of about 50 cars; that no whistle was blown nor bell rung as the train approached the man on the ties, and no stop made after passing where he had been sitting. He made no investigation to see if the man had been injured, nor did he inform any one of the perilous circumstances he saw the man in, except possibly one person, and did not know Spillman had been injured until the night of December 6th.

The petition declares that deceased was struck by a freight train between the hours of 1 o'clock and 2 o'clock a. m., December 6th. The evidence conclusively shows that no freight train passed the place where Spillman was found wounded between the hours of 10 o'clock p. m. December 5th and 5 o'clock a. m. December 6th. A passenger train (No. 22) of only 8 cars passed that point going south at about 1:47 o'clock

the morning of the 6th. A drizzling rain fell the night of December 5th, and, when this passenger train passed Derry, a heavy fog hung over the tracks there and for several miles below. This fog was so dense as to interfere with the engineer's lookout ahead of the train, and it continued until after 8 o'clock of next morning.

The engineer of the passenger train did not observe any one on the track about the point where Spillman was discovered, and therefore did not sound any alarm. The conductor testified that in the vicinity of milepost 224, while he was at the rear end of the train, he saw an object stretched out, some 10 or 15 feet from the track, which had the appearance of being a yearling calf; that he glimpsed the object, which was on the right-hand side of the track, going south, through the reflection of the back-up light on the train's rear. From the foregoing facts, deduced from the evidence, it is certain that, if the deceased was struck by one of defendant's trains, it was passenger train No. 22 which passed early the morning of December 6th. It seems to us that, if deceased had been hit by this passenger train, moving at the rate of 50 miles per hour, his body would have been hurled many feet away from the track and his skull fractured or torn away. The fact that no wounds were on his body, save the laceration of the scalp, and that blood was found on the end of a cross-tie and on the ground nearby indicates to us strongly that a train did not inflict the injury, but supports the theory that deceased, while intoxicated, fell upon the cross-tie and wounded himself.

If deceased was not struck by this passenger train, then there is nothing in the record to fix the time he was injured. He had evidently imbibed too freely. He had only traveled some 2 miles from his home when hurt. It is not improbable he fell

on defendant's track and the injury thus received, coupled with many hours of exposure to rain and cold before discovered, brought about physical conditions of which he died.

Against this theory, the evidence of the witness Bell is offered. This witness did not state that the train hit Spillman. He did say that the man he saw was in a perilous position, sitting on the end of the cross-ties of the track over which the train passed. He did not think seriously enough of the matter to investigate as to what happened, though only some 50 feet away. It is possible, as a coincidence, that this witness could have been in a position to have seen what he testified he did see, if such happened, but, as he is badly in error in many material points of his evidence, a shadow is cast against the verity of it as a whole. This witness lived at Derry. He hunted cattle back of Chopin some 8 miles away. Darkness comes early in December. He was returning home many hours after the shades of night made it impossible to recognize cattle in the woods. He was a close friend of the deceased. He states that the train he saw was a freight, and that the hour was between 11 o'clock p. m., and 1:30 a. m. He is in error on both of these material points.

It is our opinion plaintiff has failed to establish to that degree of certainty required by law that her husband's death was caused by injury inflicted by a train of defendant.

It is unnecessary to consider the alternative defense of defendant.

For the reasons herein assigned, it is ordered, adjudged, and decreed that the judgment of the lower court be, and same is hereby, reversed, annulled, and set aside, and plaintiff's suit is dismissed, at her costs.