141 So.2d 852 (1962)
Mrs. Betty Jean Fuller FINN, Individually and as natural tutrix of the minor, Donna Jeanne Finn, Plaintiff-Appellee,
v.
The EMPLOYERS' LIABILITY ASSURANCE CORPORATION, Limited, et al., Defendants-Appellants,
General Accident, Fire & Life Assurance Corporation, Intervenor-Appellee.
No. 9719.
Court of Appeal of Louisiana, Second Circuit.
May 22, 1962.
Rehearing Denied June 14, 1962.
*855 Cook, Clark, Egan, Yancey & King, Shreveport, Watson, Williams & Brittain, Natchitoches, for appellants.
Booth, Lockard, Jack, Pleasant & LeSage, Shreveport, for plaintiff-appellee.
Mayer & Smith, Shreveport, for intervenor-appellee.
Before HARDY, AYRES and BOLIN, JJ.
AYRES, Judge.
This is an action in tort wherein plaintiff, in her individual capacity and as natural tutrix of the minor, Donna Jeanne Finn, seeks to recover judgment for damages for the accidental death of her husband, Robert H. Finn, father of the minor. Made defendants are J. H. Williams and his public liability insurer.
A companion case is that of Mrs. Wanda Ware Shuford v. The Employers' Liability Assurance Corporation, Limited, et al., La.App., 141 So.2d 850, wherein plaintiff, in her individual capacity and as natural tutrix of three minor children, seeks to recover judgment for damages for the accidental death of her husband, Wesley Gray Shuford, III, father of the minors. *856 These cases were consolidated for the purpose of trial not only in the district court but also in this court.
Finn and Shuford were accidentally killed June 22, 1959, while in the employ of F. M. Fuller, who was engaged in the erection of a short-wave radio antenna tower for defendant Williams on his plantation at Lake End, Red River Parish, Louisiana. Their deaths were due to the collapse of the tower upon which they were working. In each of these cases the General Accident, Fire & Life Assurance Corporation, Fuller's workmen's compensation liability insurer, intervened and sought reimbursement, out of any recovery by plaintiffs, of compensation paid because of the accidental death of Fuller's aforesaid employees.
In the instant case, plaintiff, in her individual capacity, was awarded damages as follows:

 For loss of companionship,
 love, and affection $ 8,000.00
 For loss of support 20,000.00
 For funeral expenses 940.00
 ___________
 Total $28,940.00
and, as natural tutrix of the minor:
 For loss of companionship,
 love, and affection $ 7,000.00
 For loss of support 9,000.00
 __________
 Total $16,000.00

From a judgment signed in accordance with the aforesaid awards, defendants suspensively appealed. Plaintiff, Mrs. Finn, in answer to the appeal, prayed that the award in her favor be increased to $40,000.00 and, in favor of the minor, to $25,000.00.
To a proper understanding and appreciation of the issues, which will be hereinafter listed and discussed, it appears a résumé of certain of the facts, about which there is little, if any, dispute, is first in order.
The defendant, J. H. Williams, owns farms and ranches comprising approximately 12,000 acres in the Red River Valley. These he operates largely by means of mechanized power equipment, including tractors, trucks, cotton pickers and other harvesting equipment. He also owns and operates a cotton gin and a machine shop for the repair of farm machinery. In 1958, Williams obtained permits from the Federal Communications Commission, authorizing the use of short-wave radio communications in his farming and ranching operations. A 160-foot radio antenna tower was purchased for erection on his Cedar Grove Plantation near Natchitoches.
Williams undertook, with his own employees and two college students, to erect this tower. After the tower was erected to an altitude of 60 feet, the students got scared and quit. He, however, finally determined he was unable to further pursue the task with his own labor and equipment. Therefore, a contract was entered into with F. M. Fuller, a specialist in that line of work, to complete the erection of the tower. Fuller furnished his own employees, and the tower was erected. A base radio station was installed near the tower, and short-wave communications were conducted between the base station and 12 mobile units located in pickup trucks and cars.
Sensing the need for another antenna tower and base station, to permit communications with his ranch at Echo, in Rapides Parish, Williams designed, fabricated, and welded together, in his own machine shop at the Cedar Grove Plantation, a second 160-foot tower. This tower consisted of eight triangular 20-foot sections approximately 20 inches wide. Each section was designed to be bolted together, one on top of the other, by the use of base plates welded to angle irons at each corner of the triangle. The tower was designed to be guyed at the 60-foot, 120-foot, and 160-foot levels. Steel straps, to which the guy wires were to be attached, were welded onto the sections at these points. Pursuant to a contract between Williams and Fuller, the latter agreed to, and did, erect this tower in Rapides Parish. A base station was placed in operation and the tower served *857 the defendant's farming and ranching operations for a period of time less than a year.
During June, 1959, Williams disposed of his properties at Echo and acquired a plantation at Lake End. Following these transactions, a contract was entered into between Williams and Fuller for the latter to dismantle the tower at Echo and re-erect it at Lake End. Pursuant to this contract, Fuller and his employees dismantled the tower by lowering each 20-foot section to the ground. As thus dismantled, the tower was moved to Lake End, whereupon Fuller proceeded to re-erect it. In the course of this reconstruction, Fuller and two of his employees worked on the ground. Finn and Shuford worked on the tower. A winch truck and lines, by means of a pulley attached to the top of a gin pole approximately 12 feet in length, which was attached to the top section of the tower as it was completed, served to lift the sections of the tower for placement in position. In this manner, the first three sections were erected and permanent guy wires were attached at the 60-foot level. The erection proceeded until four additional 20-foot sections had been erected, bringing the construction to a height of 140 feet. The gin pole was then raised and attached to the top of the 140-foot section and Finn and Shuford were preparing to bring up and attach the guy wires at the 120-foot level when, with scarcely a moment's notice, the tower collapsed and the four sections above the 60-foot level and the gin pole fell to earth, causing instant death of both Finn and Shuford. No guy wires of any kind were attached to the tower above the 60-foot level. The three sections permanently guyed at that level withstood the crash.
After the accident, Fuller erected another 160-foot antenna tower for defendant Williams at Lake End across the road from the first site.
The widows and children of Finn and Shuford were paid funeral expenses and weekly compensation by General Accident, Fire & Life Assurance Corporation, Fuller's workmen's compensation insurer.
Mrs. Finn, on October 14, 1959, filed a direct action in the United States District Court for the Western District of Louisiana, at Shreveport, Louisiana, against The Employers' Liability Assurance Corporation, Limited. In this action it was alleged that the death of Robert H. Finn was due to the negligence of J. H. Williams by the manner in which the tower was constructed and specifically to the faulty and defective welding in the fabrication of the tower. An identical action was filed in the same court by Mrs. Shuford November 5, 1959. The compensation insurer intervened in each of said suits and sought reimbursement of the compensation benefits it had paid as Fuller's insurer.
The United States District Court, on February 4, 1960, sustained a motion by the defendant, The Employers' Liability Assurance Corporation, Limited, and dismissed all claims in excess of the limits of liability contained in the insurance policy sued upon. Whereupon, as will be hereinafter pointed out in more detail, plaintiff voluntarily dismissed her action in the federal court as of nonsuit, and, on February 23, 1960, refiled and reinstituted her action in the Tenth Judicial District Court in and for Red River Parish, Louisiana, against J. H. Williams and The Employers' Liability Assurance Corporation, Limited, and, under the same allegations of negligence as directed against the insurer alone in the federal court, sought damages for herself and her minor child from both defendants, in solido, for the same amounts as claimed in the previous suit. Similar action was taken by Mrs. Shuford, who refiled and reinstituted her suit in the state court for Red River Parish on February 29, 1960. In each of these actions, the workmen's compensation insurer of Fuller again intervened claiming reimbursement of compensation paid.
To these actions, the defendants-appellants filed and urged, to no avail, exceptions *858 to the jurisdiction of the court. The basis of these exceptions was that neither of the defendants was domiciled in or maintained a principal place of business in Red River Parish, and that, under the provisions of the direct-action statute, LSA-R.S. 22:655, the district court in and for Red River Parish had no jurisdiction over these suits against the defendants wherein they were sued in solido.
The defendants likewise filed, on May 5, 1960, and unsuccessfully urged exceptions of no cause and of no right of action to plaintiffs' petitions and to that of the intervenor. The basis of these exceptions was that, under the provisions of the directaction statute, plaintiffs had exhausted their optional remedy by first proceeding against the liability insurer alone, and that, as a legal result thereof, plaintiffs had waived and relinquished all rights which they had against Williams, the insured, and were, accordingly, precluded from subsequently instituting actions seeking judgments against the insurer and the insured, in solido. A further basis of the exceptions was that plaintiffs' claims were exclusively for workmen's compensation benefits.
On the merits, negligence charged to Williams was denied, and it was contended that the accident was due solely to the negligence of Fuller and his employees by the manner in which they dismantled and re-erected the antenna tower; that the decedents assumed the risk normally connected with the type of labor performed by them, and, alternatively, that the decedents were guilty of contributory negligence, particularly in their failure to place guy wires on the tower at the 120-foot level. Supplemental and amended answers were filed on behalf of defendant Williams wherein it was alleged that the limits of liability assumed by the defendant, The Employers' Liability Assurance Corporation, Limited, in its policy contract were $50,000.00 for each person and $100,000.00 for all persons in any one accident. The insurer contended, however, that the lesser limit applied to all persons in any single occurrence.
In the instant case, the defendants contend that Mrs. Finn's marriage to the decedent was null and void, and, consequently, that she was without right to assert an action for damages under LSA-C.C. Art. 2315. This assertion is predicated upon a contention that a divorce obtained by her first husband in Arkansas June 23, 1956, was an absolute nullity because of fraud perpetrated upon the court and for the want of jurisdiction of the court in which the decree was obtained.
The trial court, in a written opinion, concluded that the accident was due to the negligence of defendant Williams in the improper, faulty, and inadequate welding in the fabrication of the tower; that the limits of liability of the insurer were $50,000.00 for each person and $100,000.00 for all persons in one accident; and that the Arkansas divorce decree between Mrs. Finn and her first husband was valid, as was her marriage to Robert H. Finn.
On this appeal, the defendants-appellants rely for relief upon the following specifications of errors, wherein it is contended the court erred in holding:
1. That the Tenth Judicial District Court, as the trial court, had jurisdiction despite the fact that these cases were filed against the liability insurer and the insured, in solido, under the provisions of LSA-R.S. Art. 22:655;
2. That the plaintiffs-appellees could proceed in direct actions against the liability insurer and the insured, in solido, under the provisions of the aforesaid directaction statute after having previously exercised an option granted by the statute by proceeding in identical suits against the liability insurer alone;
3. That claims for workmen's compensation were not the exclusive remedy of plaintiffs-appellees;
4. That the cause of the accident was the negligence of defendant Williams instead of that of Fuller and his employees *859 and, in the alternative, that the decedents had not assumed the risk of their employment and were not guilty of contributory negligence;
5. That the marriage between Mrs. Finn and her first husband, Bobby Joe Berry, was validly dissolved by a decree of a court of the State of Arkansas, and, accordingly, that Mr. and Mrs. Finn were legally married.
6. Additionally, both defendants contend the awards of damages were excessive; and
7. The insurer further contends that the limit of its liability, under its contract, was $50,000.00 per occurrence or for all persons in a single accident.
We deem it appropriate, at this point, to emphasize that our labors, in reviewing this record of nine volumes and five packages of depositions and exhibits, have been greatly facilitated by the excellent briefs, containing some 292 pages, in which the issues have been fully and ably presented. Counsel for all parties are commended for the excellent performance of a task in which they may justly take great pride. We express our appreciation for counsel's utmost efforts, extending to the greatest possible degree of sincere, honest endeavor to lead us aright to a correct and just determination of the matters at issueand to save us from error.
The first of the aforesaid specifications of error relates to the jurisdiction of the trial court. These suits, as heretofore pointed out, are directed against both the insured, an alleged tort-feasor, and the insurer, in solido. The facts, pertinent to this issue, are not in dispute. The actions were filed in the district court for Red River Parish, the parish in which the accident occurred. J. H. Williams, the assured, is domiciled in Natchitoches Parish; the domicile of the insurer is in East Baton Rouge Parish. Neither the assured nor the insurer maintains a principal place of business in Red River Parish.
Notwithstanding the defendants' concession, in both brief and oral argument, that either the insured or insurer may, under the direct-action statute, be separately sued in the parish where the accident occurred, the argument is advanced that they may not be joined as defendants in a single action directed against them in solido in that parish. Reliance for the position taken is placed upon the language employed in the statute, which reads:
"* * * The injured person or his or her survivors or heirs hereinabove referred to at their option, shall have a right of direct action against the insurer within the terms and limits of the policy in the parish where the accident or injury occurred or in the parish where the insured or insurer is domiciled, and said action may be brought against the insurer alone or against both the insured and insurer jointly and in solido, at the domicile of either or their principal place of business in Louisiana. * * *" LSA-R.S. Art. 22:655.
The legislative intent, as obviously manifested in the history of the statute, does not, in our opinion, support the position taken by the defendants. Prior to the enactment of Act 55 of 1930, which has become known as the Direct-Action Statute and is now incorporated in LSA-R.S. Art. 22:655, it was well settled, under the venue provisions of the Code of Practice that a tort-feasor may be sued either at his domicile or in the parish where the tort was committed (C.P. Art. 165(9)). By the provisions of the 1930 statute, a claimant was authorized to institute an action against an insurer in the parish where the accident occurred, or at the domicile of the assured. Such actions were authorized against the assured and insurer jointly, and in solido.
Thus, under the 1930 statute, as was the case under C.P. Art. 165(9), a claimant for damages may sue the tort-feasor at the latter's domicile or in the parish where the *860 tort is committed. Such actions were, under the statute, authorized against the insurer alone or against both insurer and insured jointly, and in solido.
The statute was amended by Act 475 of 1956 and again by Act 125 of 1958. No pertinent change was made in the 1958 amendment from the provisions adopted in 1956. The amendments merely provided that the insurer could be sued not only in the parish where the accident or injury occurred but also "in the parish where the insured or insurer is domiciled." This was the change effected by the amendment, thus broadening the venue provisions of the statute. That this was the purpose of the amendments was recognized by the Supreme Court in Grand v. American General Insurance Co., 241 La. 733, 131 So.2d 46, 48, wherein it was stated:
"In its original form in the Louisiana Revised Statutes of 1950, this section read:
"`The injured person or his or her heirs, at their option, shall have a right of direct action against the insurer within the terms and limits of the policy in the parish where the accident or injury occurred or in the parish where the insured has his domicile, and said action may be brought against the insurer alone or against both the insured and the insurer, jointly and in solido.' (Italics ours.)
"It was subsequently amended by Act 475 of 1956 so as to read:
"`The injured person or his or her survivors hereinabove referred to, or heirs, at their option, shall have a right of direct action against the insurer within the terms and limits of the policy in the parish where the accident or injury occurred or in the parish where the insured or insurer is domiciled, and said action may be brought against the insurer alone or against both the insured and insurer, jointly and in solido, at either of their domiciles or principal place of business in Louisiana.' (Italics ours.)
"No change was effected in the pertinent language by its reenactment in Act 125 of 1958.
"Under a former direct action statute (Act 55 of 1930), this Court had occasion to consider the identical question here presented in the case of Miller v. Commercial Standard Ins. Co., 199 La. 515, 6 So.2d 646, 648. Therein we held that the District Court for the Parish of East Baton Rouge did not have jurisdiction of a direct action against a foreign insurer. We pointed to the language of the statute which at that time limited the venue to `the parish where the accident or injury occurred, or in the parish where the assured has his domicile * * *.' It is clear that the legislature intended in Act 475 of 1956 to accomplish a change in the law as announced in that case by authorizing suit at the domicile of the insurer." (Emphasis supplied.)
Thus, it appears that the effect of the amendments was to create another venue for this character of action and to permit an action against the insurer at its domicile, in which the assured may be joined as a defendant. No intention is indicated that the purpose was to withhold the venue of the place of the accident for a suit jointly and in solido against the insured and the insurer.
The legislative intent, in our opinion, obviously is that the injured person or his or her survivors or heirs shall have a right of direct action against the insurer in the parish where the accident or injury occurred, or at the domicile or principal place of business in Louisiana of either the assured or the insurer, and that "said action may be brought against the insurer alone or against the insured and the insurer jointly and in solido." This finding is in accord with the general rules for the construction of a statute, such as, that the *861 niceties of grammatical rules in the use of words, punctuation, or placement of phrases may not be so strictly adhered to as to obscure the true meaning of the law and to thwart the legislative intent. LSA-C.C. Art. 14; State ex rel. Priest v. Coverdale, 204 La. 448, 15 So.2d 849; Edwards v. Daigle, 201 La. 622, 10 So.2d 209; Buras v. Fidelity & Deposit Co. of Maryland, 197 La. 378, 1 So.2d 552; State v. Scheffield, 123 La. 271, 48 So. 932.
Defendants' position is obviously predicated upon the position of the phrase "at either of their domiciles or principal place of business in Louisiana" at the end of the sentence. Logically and in prior amendments, all places of venue were listed together, followed by the phrase "and said action may be brought against both the insured and the insurer, jointly and in solido." Such obvious misplacement of the phrase in the sentence should not serve to nullify the legislative intent.
In this regard, it may be observed that no reason nor basis has been advanced to support a legislative intent that an action in tort against an assured and an insurer may be instituted against them, in solido, at the domicile or principal place of business of either, and to withhold such right in an action instituted in the parish where the accident occurred, particularly in view of the fact that a separate action may be instituted, in the parish where the accident occurred or the tort was committed, against each in a separate action. Clearly, should such actions be taken against the assured and insurer, separately, in the parish where the accident occurred, the trial court could, and no doubt would, consolidate the cases for the purpose of trial. The result would be equivalent to a single action against the assured and insurer in solido. Thus, we can envision no object or purpose of the Legislature to alter or change the rule long in effect in regard to the venue of actions in tort against the assured and insurer in the parish where the accident occurred, particularly in view of the fact that, as heretofore observed, the trial court had jurisdiction of each of the defendants, and the obligation of the two defendants is in solido. LSA-C.C. Arts. 2091, 2092; Sewell v. Newton, La.App. Orleans, 1934, 152 So. 389, 393.
As pointed out in Dupre v. Consolidated Underwriters, La.App. 1st Cir., 1957, 99 So.2d 522, 528, perfect solidarity as to debtors arises when they bind themselves by the same act at the same time to the performance of the same thing, and imperfect solidarity with the same legal effects flows as from perfect solidarity when the debtors bind themselves for the payment of the same debt by different acts, or where each is obligated differently from the other for the payment of one and the same thing. See, also: LSA-C.C. Art. 2092; Cline v. Crescent City R. Co., 41 La.Ann. 1031, 6 So. 851; Gay & Co. v. Blanchard, 32 La. Ann. 497, 25 T.L.R. 230 et seq.
Even though the assured is bound in tort and the insurer in contract, their obligations, except for the limits of liability contained in the insurance contract, are the same and each may be compelled for the whole, and payment made by either exonerates the other from the creditor. Therefore, the assured and the insurer are debtors in solido to the plaintiffs in these actions. LSA-C.C. Art. 2091.
Moreover, the assured and the insurer, being obligated to the plaintiffs for the same thing, or in solido, have a common interest in the subject matter of these suits. Causes of action against two or more defendants may be cumulated in the same suit where the defendants have a common interest in the subject matter, such as where the cause of action arises from a common source, and where the issues may be determined in one judgment, thereby avoiding a multiplicity of suits. Mundy v. Gentilly Oaks, Inc., 228 La. 509, 82 So.2d 849, 854; Lykes Bros. Ripley S. S. Co. v. Wiegand M. Lumber Co., 185 La. 1085, 171 So. 453, 457; Dupre v. Consolidated Underwriters, supra.
*862 By the aforesaid test, the insurer and the assured, being bound in solido and the court having jurisdiction of each, have sufficient common interest in the litigation to be joined as defendants.
The alleged election of remedies by plaintiffs' having filed suits in the federal court upon the same causes of action constitutes the basis of defendants' Specification of Error No. 2. Defendants contend that plaintiffs are bound, by the mere filing of their suits, against the insurer alone; that their subsequent dismissal of their actions had no effect upon their election or selection of the option initially pursued by such filing; and that they were thereafter barred and precluded from subsequently instituting actions against the insurer and the assured, jointly and in solido; and, moreover, by having thus proceeded, they waived and abandoned all rights against the assured, J. H. Williams. The motion on behalf of plaintiffs for a voluntary dismissal of their actions in the federal court contains these allegations:
-1-
"That no answer, counter claim or motion for summary judgment has been filed in either of the above entitled consolidated cases.
-2-
"That all court costs have been paid in both proceedings.
-3-
"That prior to the filing of this action, complainants received information in the form of a letter dated October 2, 1959, from the Casualty & Surety Division of the Louisiana Insurance Rating Commission in Baton Rouge, Louisiana, to the effect that J. H. Williams carried insurance with Employers Liability Assurance Corporation, Ltd., with limits of $50,000/$100,000 for bodily injury. The original of this letter is attached to this motion and made a part hereof.
-4-
"That subsequent to the filing of the original petition by both complainants herein, the defendant produced a copy of the insurance policy, together with a motion filed in this proceeding, indicating that the limits of coverage of this policy are not $50,000 and $100,000, but $50,000 for each accident.
-5-
"Your complainants, believing the aggregate value of both claims to be far in excess of $50,000, have therefore filed suit in the State District Court in Red River Parish, joining with the insurance company the tort feasor, Mr. J. H. Williams, and, therefore, desire to dismiss this case without prejudice as to either complainant."
and concludes:
"WHEREFORE MOVERS PRAY that an order be entered herein dismissing each of the above entitled suits without prejudice as to the rights of either complainant.
"For all orders necessary, general and equitable relief."
On presentation of this motion to, and after its consideration by, the court, an order was signed May 20, 1960, ordering that these actions "be dismissed without prejudice as to the rights" of each of the complainants.
The direct-action statute provides, as shown hereinabove, that an injured party, or his heirs, or survivors shall, "at their option," have a right of direct action against the insurer alone or against both the assured and the insurer. Once that option's having been exercised, defendants contend that such action constitutes an irrevocable election of remedies, and that, accordingly, if an action is first instituted against the insurer alone, the injured party forfeits all rights against the assured, the tort-feasor.
*863 With this, we cannot agree. Nor can we agree that the Legislature, by the adoption of the statute, intended to make the options provided for therein exclusive of one another, or that the exercise of one option under the statute precludes or bars a resort to other options provided therein.
Nor do we believe that the options are necessarily inconsistent. The language of the statute does not warrant such an interpretation. The several options provided in the statute are, in our opinion, entirely compatible and consistent; supplementary, and not repugnant. Accordingly, the statute grants to injured parties the right to exercise any of the options together or separately.
The situation presented here, however, does not truly present a matter for an election of remedies within the meaning of the term that such election would bar or preclude the exercise of any other "option." An essential of an election of remedies is that there must be an inconsistency, repugnancy, or conflict in remedies. For instance, the general rule is stated in 28 C.J.S. verbo, "Election of Remedies," § 1 (a), p. 1057:
"* * * an election of remedies is the choice by a party to an action of one of two or more coexisting remedial rights, where several such rights arise out of the same facts; but the term has been generally limited to a choice by a party between inconsistent remedial rights, the assertion of one being necessarily repugnant to, or a repudiation of, the other. * * *
"The doctrine of election of remedies is largely a rule of policy to prevent vexatious litigation, and is widely recognized both in the federal and state courts. It is based on the rule that a party cannot, either in the course of litigation or in dealings in pais, occupy inconsistent positions, or proceed on irreconcilable claims of right; in other words, that a man shall not be allowed to approbate and reprobate." (Emphasis supplied.)
This authority further states, in § 3, Subparagraph b, page 1063, that the pursuit of one remedy will exclude the pursuit of another only where the remedies are inconsistent; where remedies are concurrent and consistent, whether against the same person or different persons, a party may pursue one or all of such remedies until satisfaction is had. In this regard, it is stated:
"* * * Where the law furnishes a party with two or more concurrent and consistent remedies he may prosecute one or all until satisfaction is had; but a satisfaction of one is a satisfaction of all. He may select and adopt one as better adapted than the others to work out his purpose, but his choice is not compulsory or final. Where the remedies afforded are inconsistent, it is the election of one of such remedies which operates as a bar; but where the remedies afforded are consistent, it is the satisfaction of the claim which operates as a bar. (Emphasis supplied.)
* * * * * *
"Where actions or defenses against different persons are consistent and concurrent, the doctrine of election does not apply and the prosecution of one does not bar the prosecution of the other; and an unsuccessful attempt to recover against one, in the absence of circumstances creating an equitable estoppel, will not bar an action against the other. * * * a party may pursue any number of consistent and concurrent remedies against different persons, until he obtains satisfaction from some of them."
As to the inconsistency between remedies, the rule is stated in 28 C.J.S., Election of Remedies § 4, p. 1066, as follows:
"While the determination whether remedies are inconsistent with each other depends on the facts in each case, as a general rule, the test is whether *864 the allegations or demands in the one action, or the facts supporting such action necessarily repudiate or are repugnant to those of the other action, regardless of the difference in the forms of action."
See, also, 6 A.L.R.2d pp. 11, 13, wherein it is declared that an

"`Election as a term in the law is properly applied to a case where a person has the choice of one or two alternative and inconsistent rights or remedies. * * *'" (Emphasis supplied.)
and, for the application of the doctrine,
"* * * it is assumed that two or more remedies are available to the litigant at the time of the election, which are repugnant and inconsistent, and that he makes his choice with full knowledge of all the facts material thereto." (Emphasis supplied.)
As hereinabove stated, we find no inconsistency or repugnancy in the options afforded under the statute to an injured person or to his heirs or survivors. Nor have defendants pointed out any inconsistency or repugnancy in the several options of procedure granted by the statute. Their presentation of the question merely extends to the fact that plaintiffs, at a prior time, exercised, to no avail, and, therefore, unsuccessfully, one of several entirely consistent and compatible options of procedure. In Sewell v. Newton, La.App. Orleans, 1934, 152 So. 389, 393, it was held that an unsuccessful suit against an insured who carried automobile liability insurance did not bar or preclude the injured party from bringing another suit against the insurer. In so holding, the court stated:
"Plaintiff needs no reservation of its rights against the insurance carrier of Sewell. Under the statute referred to (Act No. 55 of 1930), its right is to proceed directly against either the principal or the insurer, or both, and to seek solidary judgments. So long as the claim is not paid by one, the right to sue the other exists. Under article 2095 of the Revised Civil Code, where two or more persons are solidarily obligated, `a suit brought against one of the debtors does not bar the creditor from bringing suits on the same account against the others.' Furthermore, the prescription which might otherwise relieve the insurer is interrupted by the suit against the principal, for we find that in article 2097 of the Code it is provided that `a suit brought against one of the debtors in solido interrupts prescription with regard to all.'" (Emphasis supplied.)
Nor do we find any merit in the contention that the direct-action statute created separate or distinct causes of action, one against the insurer alone and another against the insurer and the insured. The statute is remedial in character, rather than substantive, and does not create causes of action. Mock v. Maryland Casualty Co., La.App. Orleans, 1942, 6 So.2d 199; Graham v. American Employers' Ins. Co., La. App.2d Cir., 1937, 171 So. 471; Robbins v. Short, La.App. 1st Cir., 1936, 165 So. 512; Tuck v. Harmon, La.App. 2d Cir., 1934, 151 So. 803; Gager v. Teche Transfer Co., La.App. 1st Cir., 1932, 143 So. 62; Rossville Com'l Alcohol Corp. v. Dennis Sheen Trans. Co., La.App. Orleans, 1931, 18 La. App. 725, 138 So. 183.
So stated the court in the Mock case, where it was recited:
"The statute merely affords a remedy and permits a direct action not under any theory that by the contract of insurance any right is created in plaintiff against the insurer but merely on the ground that, by the tort, rights are created which are permitted to be asserted directly against the insurer of the party at fault. But this is in no sense a suit in contract and it has often been held that even where the Act of 1930 is involved, nevertheless the cause of action *865 against the insurer is essentially one in tort. * * *"
See, also: Emmco Insurance Co. v. Globe Indemnity Co., 237 La. 286, 111 So.2d 115; Reeves v. Globe Indemnity Co. of New York, 185 La. 42, 168 So. 488, 489; 182 La. 905, 162 So. 724; Metropolitan Casualty Ins. Co. of New York v. Bowdon, 181 La. 295, 159 So. 394.
In the Emmco case, where an automobile owner and his insurer, as partial subrogee, brought a direct action against the liability insurer of the driver of another motor vehicle to recover damages to the automobile, it was held that the rights and obligations of the parties arose out of a single transaction and were determinable by the same evidence. It was pointed out that the plaintiff did not have separate and distinct causes of action against the defendant and his insurer.
In support of their proposition that the exercise by plaintiffs of the option to first sue the insurer alone constituted an irrevocable election of remedies and a waiver and abandonment of their rights against the tort-feasor, defendants cite the following cases: Emmco Insurance Co. v. Globe Indemnity Co., supra; Burton v. Lester, 227 La. 347, 79 So.2d 333; West v. Monroe Bakery, 217 La. 189, 46 So.2d 122; Miller v. Commercial Standard Ins. Co., 199 La. 515, 6 So.2d 646; and, on the point that the mere filing of a suit constitutes an election, cite the cases of Lowenstein v. Glass, 48 La.Ann. 1422, 20 So. 890; R. B. George Machinery Co. v. New Orleans, T. & M. R. Co., 167 La. 474, 119 So. 432.
The holdings in these cases are inapplicable to the questions presented here. No question of the election of remedies, the exercise of an option, or waiver of rights was involved.
In the West case, the issue concerned the effect of the insured's failure to comply with the provisions of the policy relative to notice to be given the insurer.
In the Miller case, a question of jurisdiction of the court was involved. From the provisions of the direct-action statute, in existence at the time, placing the venue in the parish where the accident occurred or in the parish where the assured was domiciled, the Supreme Court concluded that the court of East Baton Rouge Parish, where the defendant was domiciled, was without jurisdiction.
In the Burton case, the issue was whether the courts of the state should entertain an application for declaratory relief in a controversy arising out of an offense or quasi offense when there was an action already pending in another forum involving the liability ex delicto of one of the plaintiffs in the suit. An affirmative answer would, in the court's opinion, lead to an abuse of the declaratory-judgments act.
The Emmco Insurance Co. case, as heretofore discussed, involved a vehicular collision. As noted hereinabove, the rights and obligations of all the parties arose out of the same accident and, hence, an owner of one of the vehicles involved in the accident was entitled to intervene and have his rights adjudicated.
The Lowenstein and George cases involved an election of inconsistent and conflicting remedies. The holdings in these cases are in harmony with the rule that the commencement of a suit upon a theory which ratifies unauthorized acts or affirms a contract is a conclusive election precluding resort to a remedy based upon the theory that the same acts are invalid or that the contract is disaffirmed.
In the opinion in the George case, the court, after examining the authorities cited by plaintiff therein and finding them inapplicable, nevertheless, observed with reference to the cases cited:
"* * * They involve consistent and concurrent actions or alternative pleas."
The additional cases, Cipriano v. Sherman, 234 La. 60, 99 So.2d 23; Brown v. *866 Lancaster, 218 La. 1036, 51 So.2d 617; Borie v. Smither, La.App. Orleans, 1942, 8 So.2d 148 (writs denied); cited by defendants, involved an election of inconsistent remedies and are, likewise, inapposite.
Nor do we find that the holding in the case of Lumbermen's Mut. Cas. Co. v. Elbert, 348 U.S. 48, 75 S.Ct. 151, 99 L.Ed. 59, is particularly appropriate. It was observed by the court that, under the jurisprudence of this State, one, by bringing an action under the direct-action statute against the tort-feasor's liability insurer alone, seemingly abandoned his action against the tort-feasor. The court used the word "apparently" with reference to the abandonment. The editorial writer, after the syllabus, used the word "semble," a word defined by Black's Law Dictionary Fourth Edition, p. 1526, as follows: "* * * It is also used to introduce a suggestion by the reporter, or his understanding of the point decided when it is not free from obscurity." The word "semble" is defined by Webster's New International Dictionary: "Law. It seems;chiefly used impersonally in reports and judgments to express an obiter dictum." The court obviously had in mind a situation where an action against one solidary obligor had been proceeded with to final judgment and had been satisfied.
Thus, we conclude that, under the positive law and jurisprudence of this State, an injured person, or his heirs, or survivors may sue either the insured or the insurer alone, or both in solido, and, until such time as one or the other pays and satisfies his claim, the other may be subjected to suit.
That workmen's compensation is the exclusive remedy of plaintiffs is the contention made in defendants' Specification of Error No. 3. If compensation is the remedy, that remedy, of course, under the statute, is exclusive of all other rights and remedies. LSA-R.S. Art. 23:1032. That Williams is a farmer and rancher on an extensive scale is fully established by the record. However, farming and ranching, eo nomine, are not characterized as hazardous by the workmen's compensation statute. LSA-R.S. Art. 23:1035. Nor, have such occupations been held to be hazardous within the intent of the statute. Fontenot v. Fontenot, 234 La. 480, 100 So.2d 477; Collins v. Spielman, 200 La. 586, 8 So.2d 608; Troquille v. Lacaze's Estate, La.App. 2d Cir., 1952, 59 So.2d 505. However, the operation of machine shops, thrashing and harvesting machinery, and cotton gins, switchboards or apparatus charged with electrical current are among the occupations or businesses declared hazardous. LSA-R.S. Art. 23:1035. But, an occupation not specifically denominated hazardous by the statute may possess hazardous features by virtue of the use and operation of mechanical or power equipment. Fontenot v. Fontenot, supra; Davis v. Grain Dealers Mutual Ins. Co., La.App. 3d Cir., 1961, 128 So.2d 27 (writs denied); Costanzo v. Southern Farm Bureau Casualty Ins. Co., La.App. 3d Cir., 1960, 124 So.2d 621 (writs denied).
Thus, while Williams' business was not per se hazardous, it, at least, possessed hazardous features within the intendment and purpose of the compensation statute.
That the trade, business, or occupation of construction, erection, or demolition of a radio tower is clearly hazardous appears not only from the language of the statute with specific reference to "derricks" but through the use of power machinery in such occupation.
In giving consideration to the issues presently concerned, it may be pointed out that, pursuant to a contract between Williams and Fuller, and for a specific price, the latter undertook the task of dismantling the radio tower at Echo and re-erecting it at Lake End. This task was to be performed by Fuller, with his own labor and equipment, without any supervision, direction, or control by Williams as to the manner in which the work would be accomplished. *867 Defendants contend that the erection of the radio tower, through the fall of which the decedents met their death, was a part of the trade, business, or occupation of Williams, and that, as principal, he was liable for workmen's compensation under the provisions of the statute (LSA-R.S. Art. 23:1061), which reads:
"Where any person (in this section referred to as principal) undertakes to execute any work, which is a part of his trade, business, or occupation or which he had contracted to perform, and contracts with any person (in this section referred to as contractor) for the execution by or under the contractor of the whole or any part of the work undertaken by the principal, the principal shall be liable to pay to any employee employed in the execution of the work or to his dependent, any compensation under this Chapter which he would have been liable to pay if the employee had been immediately employed by him; and where compensation is claimed from, or proceedings are taken against, the principal, then, in the application of this Chapter reference to the principal shall be substituted for reference to the employer, except that the amount of compensation shall be calculated with reference to the earnings of the employee under the employer by whom he is immediately employed." (Emphasis supplied.)
Thus, the crucial question is whether the task undertaken by Fuller, that is, the dismantling of the radio tower at Echo and the erection of it at Lake End, constituted a normal and integral part of Williams' trade, business, or occupation.
It may be appropriate to observe that Williams, through his own employees, erected the first 60 feet of a 160-foot tower at his Cedar Grove Plantation near Natchitoches; that, upon being convinced that neither he nor his employees possessed the necessary skill, training, or experience to erect radio towers, and, moreover, realizing that he did not have the required equipment for the task, Williams contracted with Fuller to complete that tower.
In the meantime, Williams and his employees, in his machine shop, fabricated and welded the materials for a tower which he proposed to erect at Echo. Fuller was engaged by contract to erect that tower and did so with his own labor and equipment without supervision, direction, or control by Williams as to the manner in which the work was performed.
After the tower was erected and had been in use for approximately a year, Williams disposed of his property at Echo, obviously reserving the radio tower which he desired to have dismantled and reerected at a newly acquired plantation at Lake End. For this task, he again contracted with Fuller, who dismantled the tower and who was engaged in erecting it at Lake End with his own labor and equipment, again without supervision, direction, or control from Williams, at the time of the fatal accident.
That the operation of a short-wave radio system was a matter of great convenience and service to Williams' farming and ranching activities was made evident by the record, and the operation or use of such system by him may be properly and correctly said to constitute a normal and integral part of his business, but whether the task contracted and undertaken by Fuller, that is, the dismantling and reerecting of the tower, formed such a part of Williams' trade, business, or occupation presents an entirely different mattera matter more difficult of resolution.
The defendants would compare the work undertaken by Fuller to the repair, reconstruction, or maintenance of premises such as the buildings and equipment utilized as an integral part of a hazardous trade, business, or occupation. Cited in this connection are these authorities: Maddox v. Aetna Casualty and Surety Company, 5 Cir., *868 259 F.2d 51; Dodge v. Anderson, 5 Cir., 255 F.2d 246; Humphreys v. Marquette Casualty Co., 235 La. 355, 103 So.2d 895; Landry v. Fuselier, 230 La. 271, 88 So.2d 218; Speed v. Page, 222 La. 529, 62 So.2d 824; Thibodaux v. Sun Oil Co., 218 La. 453, 49 So.2d 852; Mau v. Industrial Steel Products Company, La.App.2d Cir., 1960, 119 So.2d 654; O'Brien v. Columbian Carbon Company, La.App. 1st Cir., 1959, 109 So.2d 285; Miller v. B. Lewis Contractors, La.App. 1st Cir., 1958, 103 So.2d 592; Richard v. National Surety Corporation, La. App. 1st Cir., 1957, 99 So.2d 831 (writs denied); Wynn v. Fidelity & Casualty Company of New York, La.App.2d Cir., 1956, 85 So.2d 315; Crow v. Hosier, La. App.2d Cir., 1953, 66 So.2d 380; Troquille v. Lacaze's Estate, supra; Gonsoulin v. Southern Amusement Co., La.App. 1st Cir., 1947, 32 So.2d 94; Owers v. Louisiana Long Leaf Lumber Co., La.App. 1st Cir., 1943, 14 So.2d 275 (writs denied); Hecker v. Betz, La.App. Orleans, 1937, 172 So. 816; Labostrie v. Weber, 15 La.App. 241, 130 So. 885.
In the Speed case, a workman was injured while assisting in the work of demolishing and reconstructing a theater owned by Page. The operation of a theater is a hazardous business within the contemplation of the compensation statute. The court held that, where the operator of a hazardous business, in the conduct of that business, undertook repair of either the building housing the same or the equipment used therein, such constituted a part of his hazardous business. This principle was generally recognized throughout the cited cases. The rule was extended in the Wynn case to the employees of an independent contractor who had been engaged to remove a partition wall in the employer's business. In the Mau case, the plaintiff sued in tort alleging that he was injured through the negligence of another employee. He was an employee of an independent contractor who was engaged to paint the building and equipment of defendant's plant. This court held that as
"* * * a necessary and essential part of its business included the painting of this building in connection with the maintenance of its plant, as well as the painting of machinery and equipment; * * *."
the work was a normal and integral part of the steel plant's business, and that the plaintiff's sole remedy was in workmen's compensation.
The aforesaid cases are distinguishable upon their facts from the instant case. No question of maintenance or repair is involved in the instant case. The principal's business was to operate the radio tower, after its erection, in connection with his farming and ranching activities.
A distinction exists between erection or construction and operation. This distinction was early recognized in the case of Horrell et al. v. Gulf & Valley Cotton Oil Co., 1930, 15 La.App. 603, 131 So. 709. There, plaintiff was employed by his father who was under contract with defendant to set up a brickwork and construct a furnace. Plaintiff was killed when a nearby boiler exploded. The court held that plaintiffs' action was properly brought in tort and not in compensation. In the course of its opinion, the court stated:
"It is, we believe, quite plain that a manufacturing concern, upon organization, may contract with an independent contractor for the erection of its factory building without retaining liability under the Compensation Act to employees of the independent contractor who undertakes the construction. It is no part of the trade, business, or occupation of the manufacturing concern to erect its factory building. Its business is to operate it after its erection.
"On the other hand, it is clear that, after the factory is completed and is in operation, the principal may not employ an independent contractor to undertake any part of the business of operating the factory and thus escape liability *869 in compensation to the employees actually engaged in carrying out the work undertaken by the independent contractor. For instance, if defendant here had employed Horrell to furnish the necessary labor to operate the boilers, it is quite evident that Horrell's employees would, under the provisions of section 6 of the act, be entitled to look to defendant for compensation in the event of injury. We thus see that, if the original construction work is not a part of the business of the principal, that work may be contracted away, whereas the operation of the factory after construction is completed, being a part of the business of the principal, may not be so contracted away without the retention of compensation liability.

"If the principal may contract with the independent contractor for original construction, we see no reason why he may not contract for additional necessary construction, or reconstruction later on. If the work contracted for is within the category of operation, then, of course, it may not be contracted for except under the conditions imposed by section 6." (Emphasis supplied.)
The principles enunciated in the Horrell case were adhered to in Ball v. Kaiser Aluminum & Chemical Corporation, La. App. Orleans, 1959, 112 So.2d 741. There, the plaintiff was an employee of an electrical contractor which had contracted to do the wiring in the construction of a new plant of the Kaiser corporation. Plaintiff was engaged, when the accident occurred, in changing connections on certain transformers that had already been installed and were in use in the plant. It was pointed out that the defendant did not erect nor construct aluminum plants themselves. Its business was operating such plants. The defense, nevertheless, contended that the Kaiser corporation could hardly manufacture aluminum without electricity and, therefore, the installation of wiring was a part of Kaiser's business.
In relying upon the holding in the Horrell case, the court stated:
"* * * In this case the plaintiff was engaged in his special phase of assisting in the erection of an aluminum plant, a function totally unrelated to defendant's business, which as we have said is manufacturing aluminum. The construction of new plants is not defendant's business.
"The manufacture of aluminum is not Foothill Electric Corporation's business. Obviously, in the course of their respective businesses these companies certainly have many employees performing the same or similar functions. But the mere existence of this fact does not serve to make their work part of the other's trade, business, or occupation.
* * * * * *

"We are of the opinion that the rationale of the jurisprudence is clear to the effect that unless the erection of buildings is the trade, business, or occupation of the principal or an integral part thereof, new construction such as occurred herein may be contracted to others without incurring liability for compensation." (Emphasis supplied.)
See also: Thibodaux v. Sun Oil Co., supra; Malone's "Louisiana Workmen's Compensation Law and Practice," p. 151 et seq., § 125; Larson's "Workmen's Compensation Law," p. 725, § 49.12.
The erection of an aluminum plant or the adjustment of transformers installed in said construction was thus held to constitute no part of the business of the manufacturer of aluminum. By the same logic, the erection of a radio tower is no part of defendant's occupation of farming and ranching. The erection of the tower is a departure from and is not a normal or integral part of Williams' usual business, trade, or occupation.
*870 The dismantling and erecting of radio towers is the work of specialists. It is not the work of a principal not engaged in the specialized business, trade, or occupation of erecting towers. The record is replete with uncontradicted evidence of the specialized character of tower erection. Fuller's work had extended over 17 states, from Connecticut into Mexico. His testimony was that tower erection not only required specialized skill and training but also complex and expensive machinery. He had never known a tower to be erected by an owner-operator. Thus, work requiring a specialist is not the trade, business, or occupation of a principal not engaged in the specialized business. Maryland Casualty Co. v. Gulf Refining Co., La.App. 1st Cir., 1959, 110 So.2d 784; Horrell et al. v. Gulf & Valley Cotton Oil Co., supra.
The latter case stressed the specialized character of the work when it stated:
"The record shows that the particular kind of brickwork which was being done required specialists, and that the regular employees of defendant did not engage in that kind of special work."
See, also: Maryland Casualty Co. v. Gulf Refining Co., supra; Cutrer v. Southdown Sugars, La.App. 1st Cir., 1949, 42 So.2d 314; Wilson v. Roberts, La.App. 2d Cir., 1940, 194 So. 88 (writs denied); White v. Equitable Real Estate Co., La.App. Orleans, 1932, 18 La.App. 714, 139 So. 45; Rooney v. Overseas Ry., 173 La. 183, 136 So. 486; Ranson-Rooney v. Overseas Ry., La.App., 134 So. 765; Isthmian S. S. Co. of Delaware v. Olivieri, 5 Cir., 202 F.2d 492.
Likewise, the present record establishes that the task undertaken and performed by Fuller constituted engagements not usually or customarily performed by those engaged in businesses similar in character to that of defendant Williams. Such fact would also tend to establish that the work performed by Fuller was not in the course of Williams' business.
For the aforesaid reasons, we are constrained to hold that the demolition and erection of radio towers did not constitute a normal or integral part of Williams' trade, business, or occupation of farming and ranching and that, accordingly, Williams was not a principal in the task for which he would be liable to pay compensation to the employees of Fuller, an independent contractor, or to their heirs. And, hence, plaintiffs correctly proceeded by actions in tort.
The question of fault in the occurrence, or causation, of the accident forms the subject matter of defendants' Specification of Error No. 4. The findings of the trial court were that the cause of the tower failure was due to the defective welding of defendant Williams in fabricating the tower. Defendants contend to the contrary and submit that the fault lay with Fuller in his failure to properly support the structure as it was being erected, particularly with adequate guy wires at the 120-foot level. Fault is also charged to Fuller in the manner in which the sections were erected, particularly in the leveling of the sections. Contributory negligence and an assumption of risk are charged to the decedents as an alternative proposition.
Fuller and four employees, including Finn and Shuford, proceeded with the erection of the tower without incident, or mishap, until after the seventh 20-foot section had been erected and the gin pole placed in position for the erection of the next section. Finn and Shuford, who were working on the tower, were about to descend to the 120-foot level to attach the guy wires at that point when the tower began to lean toward the north and broke at the junction of the third and fourth sections. The court below, in its written opinion, stated:
"As previously stated, the tower was fabricated by J. H. Williams, and according to his own testimony, he did 90 per cent of the welding himself. The tower design was conceived by *871 him, not from any particular existing tower, but after looking at and examining many other towers of like, similar and dissimilar design. He had no drawings or specifications to go by, nor did he furnish any particular instructions to Mr. Fuller for the erection of the tower.
"The tower was constructed for erection on a concrete base, and this base and the `dead men', or anchors for the guys, were installed by J. H. Williams. The tower consisted of eight triangular-shaped 20-foot sections. On the end of each angle iron of each section was welded a pentagonal-shaped steel plate with two holes for bolting the sections together in erection. The three sides of each section were connected with diagonal iron braces, * * *. Guy wire fixtures were attached at the top of the third, sixth and eighth sections.
* * * * * *
"This tower was erected by placing the bottom section on the concrete base and made secure by nuts screwed down on the bolts anchored in the concrete base. Temporary guys were placed on this first section. The gin pole then was placed on a corner of the section near the top. By use of the pulley in the top of the gin pole and the cathead and the necessary tackle, the second section was raised and placed in position. In the erection usually only one bolt was placed in each plate to secure the junction of the section. When necessary to plumb the tower, a washer or nut might be placed between the connecting plates. No shims or filler material was provided by defendant Williams.
"This procedure was followed then until four sections were installed. The gin pole was then placed on top the fourth section. At that point the guy wires, three in number, one from each corner of the triangle, was placed at the sixty-foot level. After this was done, the same procedure was repeated until three more sections were erected, which brought the height of the tower to 140 feet. The gin pole was moved from the 120-foot level to a position atop the seventh section.
* * * * * *
"The Court finds that during this fateful day it was hot and dry and intermittently the wind was light and described by the witnesses at the scene of the accident as a breeze. No thunderstorm activity was reported from Alexandria to Shreveport. The wind activity at the scene confirms the conclusion testified to by Mr. B. P. Hughes, Chief Meteorologist at the weather station in Shreveport:
"`Q Assuming, Mr. Hughes, that the wind velocities were as noted by you from these weather observations in England Air Force Base, and the wind velocities at the Barksdale Air Force Base and at the Shreveport Municipal Airport, would there be any reason to expect the wind velocities to be materially different in between Shreveport, Barksdale Field, and England Air Force Base with southerly winds?
"`A It appears to be unlikely.'
"With this explanation the Court will direct its attention first to a determination of whether the plaintiff has proved that the accident was caused by a defective welding of the angle irons to the base plates at the top of the third twenty-foot section and the bottom of the fourth section.
"Mr. Grant R. Ingels, a metallurgical consultant of Houston, Texas, who appeared as a witness for the plaintiff, testified that he examined in his laboratory the base plates and angle irons identified respectively as plaintiff Exhibits Numbers 11, 12, and 19. Mr. *872 Ingels, who is a graduate metallurgical engineer of the University of Illinois, has been engaged in metallurgical engineering and as a metallurgist since 1944 and is presently associated with Cook Heat Treating Company of Houston, Texas, after detailing the processes of his examination of the aforesaid exhibits, concludes unequivocably, that this tower failed (fell) because of poor welding.
"`Q I see now, one final conclusion, Mr. Ingels, based upon your study of the tower, study of the photographs which you have made, study of the scene, what you saw when you climbed the tower, what you saw in the parts on the ground, what conclusion can you give us as to the cause of this tower failing?
"`A Without equivocation, this tower failed because of poor welding, poor welds that had absolutely strength nil, just enough to hold it together.'
"This is demonstrated by an examination of [the angle irons and base plates] Exhibits P-11, P-12, P-19, and photographs P-13 through P-18 and P-28 through P-31.
"The plaintiff produced Mr. Joe Lamar Davis III, a graduate civil engineer of L. S. U. in 1948, who is chief engineer of Industrial Steel Products Company, Shreveport, Louisiana, a position he has held since 1955, and who is in charge of engineering design, detailed design, certification of welders and inspection of their performance, and who is a designer of radio towers, testified at length regarding the theory of welding, the physical processes involved in welding and what is attained in a proper weld, as well as the strength of the tower metal and bolts used in erection, and he concluded that the sole cause of the fall of this tower was improper welding.
"The plaintiff also called Dr. Leo Raub, Head of the Department of Physics, Centenary College, Shreveport, Louisiana, and who, for the past thirty-five years, has been a professor and teacher of physics; has a major in physics and a minor in mathematics and chemistry and holds a PhD Degree from the University of Nebraska. He served two years as Instructor of Physics at the University of Cincinnati, was Associate Professor of Physics at the University of Louisville for five years, and was with the Department of Physics at Virginia Institute of Technology for 15 years, and was Head of the Physics Department at Southeastern Louisiana State College for 15 years, and is now serving his third year as Head of the Department of Physics at Centenary College. The subjects taught by Dr. Raub include forces, equilibrium forces, the effect of forces in producing motion, work energy, etc., and the court finds him eminently qualified in that field. Dr. Raub testified that he went to the scene of the accident, and obtained pertinent data with which to make his computations. This witness, in collaboration with Mr. Davis, made a series of computations based on the tensile strength of the metals used in this tower, with wind forces up to 35 miles per hour, assuming the tower to be at various stages out of plumb, and found that, assuming good welds, the tower would not have failed. The upward limits of his computations is best demonstrated by the following testimony * * *:
"`Q Actually, if we can assume that Mr. Davis was correct in his testimony this morningI am not asking you to make a special finding on that point. I am just asking you to assume that his testimony is correct. Could the forces that were exerted on this tower, assuming that it was not more than three feet out of plumb, with a 35-mile-per-hour *873 windcould that have been sufficient to break those welds if the welds were good?
"`A No, Sir.'
"From the testimony of Dr. Raub, who took such things as the force of the wind, the tensile strength of the iron used in fabricating the tower, the various stages or degrees of plumb of the tower, the presence of only one bolt in the connecting plates of the sections and concluded that had the welds been good, the tower would not have failed.
"From the clear, concise and understandable testimony of Messrs. Ingels and Davis, it was shown that the welding on this tower, and specifically that performed on Plaintiffs' Exhibits Numbers 11, 12 and 19, was wholly inadequate and defective.
"According to the testimony of Mr. Ingels and Mr. Davis, both experts in the process of welding, the welds, properly executed, would have been the last part of the tower to fail. An examination of Exhibits P-11, 12, and 19 clearly shows that the base metals separated; i. e., the angle iron separated from the base plate. In the few small places where a flow of the metals did occur in welding, one can see a tearing of the metal.
"The defendant offered no testimony whatsoever in an attempt to prove the worth or integrity of these welds in question. In fact, the defendant's expert, Mr. Edwin J. Staubitz, whose testimony will be discussed more fully, infra, testified that these were poor welds. Another pertinent fact that should be mentioned on this score is that the defendant requested the plaintiff to deliver the tower legs identified as Plaintiff Exhibits 11, 12, and 19 to Shilstone Testing Laboratory in Houston, Texas. Mr. Ingels testified that a Mr. Sam Bryant of Shilstone Testing Laboratories came to his office and secured these exhibits, and after the lapse of a short period of time, returned them to him. The defendants have not seen fit to produce a representative of Mr. Sam Bryant of Shilstone Testing Laboratories to testify as to their findings, and the court can only assume that this testimony would have been unfavorable to them. Further, Mr. Staubitz testified that he was advised by a representative of Shilstone Laboratories that the welds were defective.
"Of all the specifications of alleged negligence of the decedents and F. M. Fuller, the only one that merits any discussion is:
"`(f) In continuing with the erection of the tower past the 140-foot level without any guy wires located at the 120-foot level or at any place past the 60-foot level.'
"Apparently what is intended by the defendants in this charge of negligence is that the named persons were negligent in continuing with the erection of the tower past the 120-foot level without placing guy wires at that level, because these workmen did not erect beyond the 140-foot level.
"The witness, Mr. Edwin J. Staubitz, a consulting engineer of Pittsburg, Pennsylvania, specializing in radio transmission and high tension towers, whose testimony was offered by the defendants, testified as to his conclusions, as follows:
"`Q Now, I'll ask you from your calculations of the factors involved that you mentioned and from your consideration of the different things you saw and the ones that you pointed out, had pictures taken of some of them and referred to others, have you come *874 to any conclusion as to the cause of the failure of the tower?
"`A Yes, Sir. I have.
"`Q And what is your conclusion?
"`A My conclusion is the omission of the second set of guys, or the guys that should have been installed at the one-hundred-and-twenty-foot level, exposed the welds of the south corner leg splices to failure stresses, and that the absence of those permanent guys, or a set of supplementary guys, which could have been located at the one hundred foot level are the primary cause of this failure.'
"The erection of towers of this sort is a highly specialized business. Mr. Fuller and his two workmen, Huber and Moore, testified that the procedure used by them was the same as is used by other erectors. It conformed to this accepted standard of that trade and business and has proved satisfactory in the past. Their explanation of why it was necessary to erect one section above the guy point before affixing the guy wire is clearly reasonable and understandable. The gin pole must be elevated out of the way for the guys to be attached, and it cannot be done without placing another section on top of the guy point.
"The steel experts testified that enough safety factor must be included in the design to permit this procedure. From the testimony of Dr. Raub, it is clear that the ultimate strength of the steel used in the tower and the strength of the bolts had not begun to be approached by adding the seventh section, plus the gin pole and the two workmen. This was corroborated by Mr. Davis.
"The court cannot reconcile the conclusions reached by Mr. Staubitz with the findings and conclusions of Mr. Ingels, the metallurgist, and Mr. Davis, the radio tower designer, both of whom are experts on welding, and the testimony of Dr. Raub, the physicist and expert on forces. As we look back now on this accident, and for that matter, in retrospect, on any accident, it is not difficult to discern ways and means that could have been employed to avert such.
"The court cannot give to the testimony of Mr. Staubitz the weight it feels compelled to give to the other witnesses just named. The latters' testimony and the conclusions reached by them appear to be well reasoned, realistic and grounded in demonstrable facts.
"In passing, the court feels it should comment on the testimoy of witnesses, Mrs. George Mallett, Lull Hankins, L. E. Hicks and William Ammons. None of these witnesses have any experience in tower erection, and for that matter, none had any previous experience as tower erection observers. One of the most pronounced fears of mankind is that of falling. It naturally makes one untrained in this type work nervous to watch men move around up and down on such a slender object as a radio tower. No doubt these persons observed the tower leaning prior to its collapse. It was shown that one of the properties of steel is that it will bend, or stretch, to a certain point without deformation. The court believes that these witnesses, prior to the separation of metals at the junction of the third and fourth sections, were observing the natural flexibility of the tower with the men working on it.
"There is no evidence to contradict or disprove the showing that the tower was being erected according to the standards and procedures of that trade; nor is there any evidence whatever that *875 the tower was damaged in the dismantling process at Echo.
"There is no merit in the defendants' charges of negligence and the court finds no contributory negligence on the part of the decedents or their employer, F. M. Fuller. Certainly, there was no assumption of risk on the part of the decedent.
"The conclusion is inescapable that the sole and proximate cause of the tower failure was the improper, faulty and inadequate welding of the defendant, Williams, in the fabrication of the tower, which resulted in the death of Wesley G. Shuford II and his co-worker, Robert H. Finn." (Brackets supplied.)
With further reference to the charge of negligence directed to the decedents, it may be pointed out there is no evidence whatsoever that they were aware of any danger. Nor is there any evidence to indicate a timely warning from Fuller or the two fellow employees, or from anyone else, of any danger to these young men. Nor is there evidence of any fact or circumstance indicating to the decedents, their employer, or fellow employees, the presence of danger. These parties were trained and experienced in this kind of work. None of them observed anything prior to the moment before the failure of the tower that portended or foreshadowed a calamity.
Contributory negligence may not be presumed nor established by conjecture. As was stated in Tassin v. Downs, La. App.2d Cir., 1939, 190 So. 232 (writs denied), when a victim has been silenced in death and, when there is no creditable evidence to the contrary, the law presumes that he complied with the law in every respect until and including the moment of the accident. This principle has long been recognized in the jurisprudence of this State, as evidenced by the observations made by the Supreme Court in Stansbury v. Mayor and Councilmen of Morgan City, 228 La. 880, 84 So.2d 445, 448, wherein it was stated:
"Defendants introduced no evidence to show contributory negligence and none was shown. Whenever this defense is pleaded it is incumbent upon the party pleading it to prove it by a preponderance of evidence. Clements v. Louisiana Electric Light Co., 44 La.Ann. 692, 11 So. 51, 16 L.R.A. 43, 32 Am.St.Rep. 348; Layne v. Louisiana Power & Light Co., La.App., 161 So. 29, 35. It was pointed out in the Layne case that when a person is employed in the presence of a known danger, to constitute contributory negligence, it must be shown that he voluntarily and unnecessarily exposed himself to the danger and where there are no eye-witnesses to any act of negligence it is presumed that the decedent acted with ordinary care. The court in the Layne case quoted from Adams v. Iron Cliffs Co., 78 Mich. 271, 44 N.W. 270, 18 Am.St. Rep. 441 the following: `"`The reason for this rule is that life is dear to the normal person, and that he will not willingly do the thing which will extinguish it, but, on the contrary, will exercise due care to preserve it.'"'"
Thus, it may be said that, in the absence of clear and creditable evidence to the contrary, this presumption of due care on the part of a deceased victim rises to the dignity of evidence. Finn and Shuford possessed all of the normal instincts for self-preservation. They were happily married and were living a congenial family life with their wives and children. They had a right to rely on those on the ground to properly discharge their duties and to observe the plumb of the tower. It is inconceivable that Fuller would have permitted a continuance of the work *876 after the development of a dangerous situationa situation dangerous to the lives of his employees, one of whom was related to him by marriage. In this connection, it may be pointed out that Finn and Shuford were on the tower through the instructions of their employer to do the work assigned to them. The evidence failing to establish that the decedents were in any manner aware of the unusual danger prior to the accident or that they exposed themselves to a known danger, the principle of the assumption of risk and contributory negligence is without application.
The applicable rules are that, where the defense relied on is the assumption by the employee of the risk to which he was subjected, it must appear with reasonable certainty either that he was specifically informed of such risk or it was so obvious that it could not have escaped his attention. Nor can an employee be understood as contracting to take upon himself risks which he neither knows, nor suspects, nor has reason to look for; rather, it would appear more reasonable to imply a contract on the part of the master not to invite the servant into unknown dangers than for the servant to run the risk of them. Wirth v. Alex Dussel Iron Works, 140 La. 1056, 74 So. 551; Collins v. Krause-Managan Lumber Co., 136 La. 303, 67 So. 12; Johnson v. Christie & Lowe, 117 La. 911, 42 So. 421; Stucke v. Orleans R. Co., 50 La.Ann. 172, 23 So. 342.
Fuller testified, as found by the trial court, that the installation and erection of the tower were in accordance with the best practices and customs of the trade, not only as to the erection itself but also as to supports for the structure with guy wires and by plumbing and leveling of the sections through the use of metal parts in shimmying between the plates of the respective sections.
Nor does the record establish that the failure to insert two bolts where only one was applied in any manner affected the failure of the tower. To the contrary, the evidence is conclusive not only that one bolt was sufficient, as was customarily used, but that the failure of the tower in this particular instance was not due to the bolts, which were shown to have held, but due to the defective welds which disintegrated. Hence, we conclude, as did the trial court, that Fuller was without fault.
Nevertheless, Fuller's negligence, if any, would not aid the defendants. In Day v. National-U. S. Radiator Corporation, La. App., 1st Cir., 1959, 117 So.2d 104, 125, an action was instituted against third parties for the death of plaintiff's husband who was employed by Vince Plumbing Company while engaged in installing a hot water system in a building at Greenwell Springs Hospital. The employer's compensation insurer intervened in the suit. The architect's insurer was held liable because of the architect's negligence in his failure to properly supervise the work and by his approval of a brochure relating to the system despite two prior disapprovals thereof by consultant engineers. A defense was advanced as a basis for a release and discharge of liability, the same as here, that the employer was negligent. With regard to this defense, the court very properly stated:
"The architect maintains he should be released herein because the evidence shows Vince was negligent in failing to install a pressure relief valve on the system. We agree that the record is replete with evidence of gross, inexcusable negligence on the part of Vince but this can be of little comfort to the defendant architect. The negligence of the architect combined with that of Vince in contributing to the injury and renders him liable in solido. It is basic law that one whose negligence combines with that of another to cause injury cannot plead the negligence of such other as a defense to an action *877 by the injured party." (Emphasis supplied.)
Therefore, the conclusion is that, if the charges of negligence directed against Fuller were supported by evidence, which, in our opinion, was not established, such fact could not, under the jurisprudence, avail the defendants, as Williams' negligence was, in any event, a proximate cause of the accident.
The coverage afforded Williams by the public liability insurance policy is the subject of Specification of Error No. 7. The defendant, Williams, as do the plaintiffs, contends that the limits of coverage are $50,000.00 for each person and $100,000.00 for all persons in any one accident. The defendant insurer, however, asserts that the maximum coverage is $50,000.00 for each occurrence; that, since Finn and Shuford met their deaths in a single accident, there was only one occurrence; and that that limitation of liability applied. The issue thus raised is a matter to be resolved by resort to the language of the policy and the endorsements attached thereto.
The limitation of liability of $50,000.00 for each person and $100,000.00 for all persons injured in any one accident appears clearly and unmistakably within the recitals of the policy. For this coverage, as well as the coverage afforded by the endorsements relied upon by the insurer, an advance premium of $298.85 was indicated. The coverages afforded by the endorsements indicated an advance premium of $166.92 which, deducted from the former, leaves $131.93 as an indicated advance premium for liability as included within the limitations of $50,000.00-$100,000.00.
The coverage afforded by the latter limitations is contained under Coverage BBodily Injury LiabilityExcept Automobile, wherein the insurer obligated itself unto Williams
"To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person and caused by accident."
It would seemingly appear, from the endorsements, that, in addition to coverage afforded by the general provisions of the policy, coverage was extended to include liability for products hazards, subject to a limitation as to that form of liability of $50,000.00 for each occurrence, as provided under the endorsement designated "Individual as Named InsuredFarmer."
In accordance with the language of the policy, products liability insurance covers liability for damages imposed by law upon the insured because of bodily accidental injuries or death therefrom resulting from defects in goods or products manufactured, sold, handled, or distributed by the insurer or by others for whom he is responsibleif the accident occurs away from the premises owned, rented, or controlled by the named insured. It also covers work or services performed by the named insured provided the accident occurs after the insured has completed or abandoned the operation and the accident occurs away from the premises owned, rented, or controlled by the named insured. If the product has been delivered by the insured and is away from the insured's premises, claims for accidental bodily injuries or death will come within the coverage of a products liability policy. Products Liability, Vol. 2, Chap. 19, "Products Liability Insurance," p. 1101 et seq.
Such products liability coverage is therefore inapplicable to the facts of the instant case because of (1) the defective welding of the materials for a radio tower, the erection of which formed no part of the insured's business of farming or ranching and, hence, no part of his occupation as a farmer; and (2) the materials were not intended for sale or transfer to others; and, moreover, (3) the accident occurred *878 while said defectively welded materials remained on the insured's premises as his property and in his possession. Under such circumstances, other forms of insurance would apply, such as the coverage afforded by the present policy for tort liability of the insured.
Nor do we find that the provisions relating to products hazards supersedes or controls or in any way limits the coverage afforded as to the general tort liability of the insured. If it could be said that it was the intention of the insurer to reduce its maximum liability to $50,000.00 for each occurrence, the language of the policy and the endorsements attached thereto are most ambiguous and indefinite in that respect. The policy and the endorsements attached thereto were executed simultaneously and took effect at the same time. Therefore, what would be the purpose of inserting a limitation of liability of $100,000.00 and, at the same time, reciting another limitation of $50,000.00? Had it been the intention to limit the liability under the policy to the latter amount, it would have been just as easy to have inserted that limitation to begin with. As heretofore stated, a definite premium was indicated for the coverage included in the greater limitation of liability, as was another premium indicated for the products liability coverage. Consequently, it clearly appears that coverage was afforded for the maximum-stated limitation under the general tort liability features of the policy.
We have been unable to determine that the liability afforded by the policy has been in any manner restricted or affected by the language of the endorsements. The endorsements, as stated, concerned products liability of the insured as a farmer. The policy, as stated, is comprehensive in form, and definite and positive as to the limits of liability. However, should any conflict or ambiguities exist in the language of the insurance contract, such ambiguities, in conformity with the universal rule, must be construed in favor of the insured and against the insurer. Albritton v. Fireman's Fund Ins. Co., 224 La. 522, 70 So.2d 111.
Moreover, the rule is well settled that the provisions of insurance contracts are to be strongly construed against the insurer, and that, in cases of ambiguity, constructions of a policy will be adopted which are most favorable to the insured. Mutual Life Ins. Co. of New York v. Hurni Packing Co., 263 U.S. 167, 44 S.Ct. 90, 68 L.Ed. 235, 31 A.L.R. 102; Finley v. Massachusetts Mut. Life Ins. Co., 172 La. 477, 134 So. 399; Jones v. Standard Life and Accident Insurance Co., La.App. 2d Cir., 1959, 115 So.2d 630 (writs denied).
Construing the policy in accordance with the aforesaid rules, the conclusion is inescapable that the endorsements effected no change in the comprehensive general tort liability, particularly with reference to the specified limitations of liability. Such was the conclusion of the trial court. We find no basis for disagreement.
In the instant case, under Specification of Error No. 5, defendants indirectly attack plaintiff's marriage to the decedent by a collateral attack upon a prior decree of divorce granted by a court in the State of Arkansas. The basis of the attack is twofold: (1) that the decree was obtained through fraud, and (2) that the court was without jurisdiction.
That neither a putative wife nor children born of a putative marriage may assert an action for damages under LSA-C.C. Art. 2315 for the wrongful damage of the husband and father is firmly established in the jurisprudence. The provisions of this article have been literally construed. Rights of action granted therein are restricted to the persons specially designated as beneficiaries. As to a widow and children, the rights thereunder have been restricted *879 to the lawful wife or widow and to the legitimate children, or to those who have been duly legitimated. Sesostris Youchican v. Texas & P. Ry. Co., 147 La. 1080, 86 So. 551; Green v. New Orleans, S. & G. I. R. Co., 141 La. 120, 74 So. 717; Vaughan v. Dalton-Lard Lumber Co., 119 La. 61, 43 So. 926; Jackson v. Lindlom, La.App.Orleans, 1955, 84 So.2d 101 (writs denied).
Applicable to the instant case is a statement of principles set forth in the case of Navarrette v. Laughlin, 209 La. 417, 24 So.2d 672, 674, wherein it was observed:
"It is well settled that anyone at interest has the right to collaterally impeach a decree of divorce rendered in another state by proving that the court had no jurisdiction. Williams v. North Carolina, 325 U.S. 226, 65 S.Ct. 1092, 89 L.Ed. 1577, 157 A.L.R. 1366.
"The judicial power to grant a divorce is founded on domicile. Bell v. Bell, 181 U.S. 175, 21 S.Ct. 551, 45 L. Ed. 804; Andrews v. Andrews, 188 U. S. 14, 23 S.Ct. 237, 47 L.Ed. 366; Williams v. North Carolina, supra. Also see: Haddock v. Haddock, 201 U.S. 562, 26 S.Ct. 525, 50 L.Ed. 867, 5 Ann. Cas. 1; Davis v. Davis, 305 U.S. 32, 59 S.Ct. 3, 83 L.Ed. 26, 118 A.L.R. 1518.
"The only question we can consider with respect to the Mississippi decree is the jurisdictional requirement of domicile. Williams v. North Carolina, supra; Voorhies v. Voorhies, 184 La. 406, 166 So. 121; State v. Wenzel, 185 La. 808, 171 So. 38; State v. Dickinson, 191 La. 266, 185 So. 20.
"The burden of undermining the verity of the Mississippi decree rests heavily upon the assailants.
"This Court will give full faith and credit to divorce decrees rendered by courts of other states except where it has been conclusively shown by sufficient proof that the court rendering the decree did not have the jurisdictional requirement of domicile. Williams v. North Carolina, supra; Voorhies v. Voorhies, supra; State v. Wenzel, supra; State v. Dickinson, supra."
The general rule, so far as pertains to the issues herein concerned, is concisely stated in 17A Am.Jur., p. 136, verbo, "Divorce and Separation," § 952, as follows:
"Where recognition of a foreign divorce decree, in so far as it grants a divorce, is sought under the full faith and credit clause, it is not an independent ground of attack that the decree was procured by fraud; the only ground of attack is want of jurisdiction. It is true that several cases say that a decree obtained by fraud will not be recognized, but they refer either to the fraud which will justify a refusal to recognize the divorce by comity, or to a fraud by which the divorce court is induced to believe that it has jurisdiction when it has none; and in the latter case the divorce is void on the ground of want of jurisdiction and not on the independent ground of perjury or other fraud.
* * * * * *
"A divorce decree of a sister state, entered by a court which has jurisdiction, cannot be collaterally attacked on the ground that plaintiff obtained the decree by untruthful testimony concerning the ground for divorce. * * *"
Therefore, the only question we can consider with respect to the validity of the Arkansas decree is the jurisdictional requirement as to domicile. The plaintiff offered in evidence a copy of the decree of the Arkansas court. While this offering was not properly authenticated, in accordance with the laws of Congress bearing upon that subject, the defendants tendered for filing such a copy of the entire proceedings.
*880 In actions for divorce, the litigants are in accord that the law of Arkansas requires residence on the part of, at least, one of the parties for a period of, at least, 90 days prior to the entry of a final judgment, and two months prior to the institution of the suit.
Mrs. Finn and her former husband, Bobby Joe Berry, were separated in October, 1955. Berry took her to Arkansas at that time. After that date, Mrs. Finn had no knowledge of the residence of her former husband, although he was in Shreveport during a portion of February, 1956, when he arranged, so she says, for a suit for divorce to be filed by her against him in Caddo Parish. The demands made in that action were rejected February 29, 1956. The suit in Arkansas was filed May 22, 1956, and a divorce predicated thereon was granted June 23, 1956.
Before the suit was filed in Arkansas, approximately seven months intervened after the parties' separation in Shreveport, and three months, after the dismissal of the action in Caddo Parish. Obviously, Berry could have established a domicile in Arkansas at any time after he took his wife to Arkansas. There was even ample time to establish such a domicile between February 29, 1956, and May 22, 1956. So far as the record shows, no one knew of Berry's domicile after October, 1955, except as found by the Arkansas court.
In an effort to show a residence in Houston, Texas, the defendants produced evidence that one Bobby Joe Berry worked in Houston from April 17th through May 4, 1956. This, we think, is insufficient for the purpose, even though the party gave his mother's local address to which notices and checks might be mailed. The testimony in this record reflects that iron workers pursue their labors over widespread areas of the country. The 17 days' employment in Houston would indicate only a temporary job unaffecting any domicile or residence that he might have established. The trial court observed that, so far as the record established, Berry may yet be a resident of Arkansas.
The trial court was of the opinion the defendants had not sustained their burden of attack upon the Arkansas decree of divorce, and held that the judgment was entitled to be given full faith and credit in this State. We find no manifest error in this conclusion.
Finally, for consideration, is the question of an adequate award of damages for the widow and minor child, for the loss of support and for the loss of love, affection, and companionship of their husband and father. Mrs. Finn had been previously married at an immature age of 16 years. That marriage ended in a divorce. She and Finn were subsequently married and, from the evidence of her more maturity and of the affection and devotion each manifested toward the other, a more stable union was in all probability established. At the time of the fatal accident, Finn was 25 years of age, Mrs. Finn 24 years of age, and the minor seven months of age.
Finn, at the time of his death, had a life expectancy of 38.81 years. His earnings at the time were approximately $90.00 per week, based on a pay scale of $2.25 per hour. At the time of trial, the rate had increased to $3.25 per hour. Finn's earnings were, therefore, at the time of his death, approximately $4,500.00 per year. This constituted the entirety of his income, so far as the record discloses, and was expended for the family. The family was entirely dependent upon his wages for support.
In the case of Swillie v. General Motors Corporation, La.App.3d Cir., 1961, 133 So.2d 813 (writs denied), the decedent was 29 years of age, with a life expectancy of approximately 36 years. He left a widow and two children whose ages were four years and one year, respectively. Swillie *881 was a gravel hauler netting approximately $3,600.00 per year from his work. By comparison, Swillie was four years older than Finn and earned about $900.00 per year less. Even so, the widow was awarded $10,000.00 for the loss of his love, affection, and companionship, and $27,794.20 for the loss of support. The elder of the two children was awarded $10,000.00 and the younger child $12,000.00 for the loss of their father's support. Each was awarded $6,000.00 for the loss of the love, affection, and companionship of the father.
The awards made in the case of Stephens v. Natchitoches Parish School Board, La. App., 3d Cir., 1962, 137 So.2d 116, have been called to our attention. In that case, the decedent was 41 years of age, engaged as a traveling salesman for a radio and TV supply firm, and earned, net, about $400.00 per month. Surviving were a widow and a 14-year-old daughter. Again, by comparison, Stephens was 16 years older than Finn and, of course, had a shorter life expectancy. Nevertheless, their gross earnings during their life expectancies were comparable in amount. Mrs. Stephens was awarded $35,000.00 for the loss of support and $10,000.00 for the loss of the love, affection, and companionship of her husband. The daughter was awarded $9,000.00 for the loss of support and $10,000.00 for the loss of the love, affection, and companionship of her father.
By a comparison with the awards made in the cited cases, we find the awards in the instant case inadequate. We, therefore, conclude the awards should be increased. Mrs. Finn is entitled, in our opinion, to an award of $10,000.00 for the loss of her husband's love, affection, and companionship, and $30,000.00 for the loss of support and for reimbursement of funeral expenses. The minor is, in our opinion, entitled to an award of $10,000.00 for the loss of its father's love, affection, and companionship, and $10,000.00 for the loss of support.
Therefore, it is Ordered, Adjudged and Decreed that the judgment appealed be, and it is hereby, amended by increasing the principal sum of the award in favor of plaintiff, Mrs. Betty Jean Fuller Finn, individually, to $40,000.00, and by increasing the principal sum of the award in favor of Mrs. Betty Jean Fuller Finn for the use and benefit of the minor, Donna Jeanne Finn, to $20,000.00.
It is further Ordered, Adjudged and Decreed that the judgment as amended hereinabove be, and it is, further amended by the recognition of the contractual limits of liability of the insurer, and that, accordingly, of the aforesaid awards, the said insurer, The Employers' Liability Assurance Corporation, Limited, is condemned, in solido, with the defendant, J. H. Williams, for the payment of $50,000.00 plus interest and costs as assessed in the judgment appealed, and, accordingly, the insured, J. H. Williams, is condemned, individually, for payment of the remainder of said judgment as herein amended, which, as thus amended, is affirmed at defendants-appellants' cost.
Amended and affirmed.